PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 17-1576
———

UNITED STATES OF AMERICA

v.

WARREN CHARLES GREEN, IV,
                                        Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(3-13-cr-00016-001)
District Judge:  Honorable Kim R. Gibson

———

Argued October 23, 2017
Before:  GREENAWAY JR., NYGAARD and FISHER,
*Circuit Judges*.

(Filed:  July 25, 2018)

Lisa B. Freeland, Esq.
Christopher B. Brown, Esq.
Kimberly R. Brunson, Esq. *[ARGUED]*
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222
                    *Counsel for Appellant*

Scott W. Brady, Esq.
Rebecca R. Haywood, Esq.
Michael L. Ivory, Esq. *[ARGUED]*
Office of United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
                    *Counsel for Appellee*

_____

OPINION OF THE COURT

_____


FISHER, *Circuit Judge*.

Following a traffic stop, police discovered approximately twenty pounds of heroin in the trunk of the car driven by Warren Charles Green, IV. Green appeals his resulting conviction, claiming that the traffic stop was both instigated and prolonged in violation of the Fourth Amendment. Finding no constitutional violation on either front, we will affirm the conviction.

I

## A. Factual Background

This case involves three separate traffic stops, all performed by Pennsylvania State Trooper Michael Volk, that are arguably relevant to Green's constitutional claims. As a drug interdiction officer, Volk's duties largely consist of traveling on the Pennsylvania Turnpike in an unmarked cruiser to search for drugs, money, and weapons. Each of the stops occurred on the Turnpike in the vicinity of Somerset, roughly 70 miles east of Pittsburgh. The first stop involved two men with no further direct connection to the case. The latter two stops both involved Green. The Government argues that information Volk obtained during the first stop helped contribute to reasonable suspicion of Green's criminal activity during the final stop, which led to the heroin discovery.

*April 3, 2013*

Volk stopped a vehicle traveling eastbound on the Pennsylvania Turnpike. This stop did not involve Green, but rather two other men who, like Green, are black. The men had a dog in their back seat. Volk's stated reason for the stop was for following too closely, but he suspected that the stopped vehicle and another vehicle traveling close by were involved in drug trafficking. The occupants stated that they were traveling to Long Branch, New Jersey, in order to breed the dog, which they described as an "American Bully." Volk's computer was not working at the time, so he let the individuals go with a verbal warning. Later that day, Volk learned that at least one of the occupants was on federal pretrial release for drug violations.

*April 4, 2013*

At approximately 8 a.m. the next day, Volk simultaneously pulled over two separate vehicles traveling eastbound on the Turnpike. Again, Volk believed that the two

3

cars were travelling together and involved in drug trafficking. The stated reasons for the stops were a license plate violation and illegal window tinting. Both drivers denied knowing each other. The first driver, a white male, informed Volk that he was traveling to Baltimore for work. Green drove the second vehicle and informed Volk that he was going to Philadelphia to see family. When Volk asked Green how long he was planning to stay in Philadelphia, Green initially responded, "I don't know. That all depends," at which point Volk began to speak over him, laughing, and asked, "You don't have to get back for work or anything?" Green explained that he owned a barbershop, so he had a good amount of flexibility with regard to the hours he worked. Nothing else was discussed about the planned duration of Green's trip and the conversation diverted to other topics. A check of Green's license revealed that he had multiple prior arrests for drug and weapon offenses, though Volk was unaware if Green had any prior convictions.

After several minutes, Volk brought Green to the rear of Green's vehicle and issued a warning for the window tint violation. Green told Volk that he had only recently purchased the vehicle and that the windows had been tinted by the previous owner. Volk then told Green he could continue on his way. As Green was walking back to the driver's side of his car, Volk asked him if there was anything in the vehicle that should not be there. Green responded that there was not. Volk then asked for Green's consent to search the vehicle and Green acceded, eventually signing a waiver. Volk searched Green's vehicle, including the engine compartment, for roughly twelve minutes and did not discover any contraband. In fact, Green did not have any luggage or baggage of any kind in his vehicle. While conducting the search, Volk detected the smell of raw

4

marijuana in the trunk compartment and noticed that the trunk liner was pulled back. Volk did not discuss any of these observations with Green. Following the search, Volk allowed Green to continue on his way. Volk also received consent to search the other vehicle and similarly uncovered no contraband.

*April 5, 2013*

At approximately 10 a.m. the following day, Volk was removing debris on the side of the Turnpike and noticed Green's vehicle traveling westbound. By his own admission, Volk decided at this point that he would try to find a reason to stop Green. Volk followed Green and ascertained his speed by "pacing" Green's vehicle. When pacing, an officer finds the speed at which his vehicle remains equidistant from the target vehicle in order to assess the target vehicle's speed. *See* 75 Pa. Cons. Stat. § 3368 (requirements for pacing). Here, Volk followed one to two-tenths of a mile behind Green's car for a distance of roughly six-tenths of a mile. The speed limit on that portion of the Turnpike was 65 miles per hour. Volk determined that Green was traveling 79 miles per hour and pulled him over. After walking up to Green's window, Volk feigned surprise, saying, "You again!" in a light-hearted manner. When Volk noted that he pulled Green over for speeding, Green apologized and said that he had left the cruise control on while going down a hill. As Green was gathering his license and registration, he asked Volk, "How you doin' today?" Volk replied and then asked Green how he was doing, to which Green responded, "I can't complain. I got a dog, so." Volk then observed a dog in the back of Green's vehicle and believed it was—or at least resembled— the dog from the April 3 stop. Volk asked Green why he had returned from Philadelphia after only one day, despite saying the day before that he would be there for "a couple days." As

5

quoted above, Green did not actually say he would be gone "a couple days" during the earlier stop, but that was how Volk remembered the previous day's conversation. In any event, Green explained that he was returning from Philadelphia because his daughter had just broken her leg, so he had to hurry back to take care of her. This conversation lasted about forty seconds.

After returning to his cruiser with Green's license and registration, Volk immediately called a colleague to fill him in on the events dating back to April 3. This phone call lasted roughly two minutes and had a decidedly jocular tone. Volk had already requested backup prior to his initial conversation with Green and waited in his vehicle for its arrival. It is unclear whether Volk also requested a canine unit at this time. About eight minutes after the end of his phone call, and with backup not having arrived, Volk called Green to the rear of Green's vehicle.[1] Volk again issued Green a warning and Green struck up a lengthy conversation about his daughter's injury. During this exchange, both Volk and Green stood at the rear of Green's vehicle observing the dog through the back window. Green described the dog's breed as a "Cane Corso" or "Presa Canario," and related that he had bought the dog from a kennel somewhere outside of Philadelphia, though he could not recall the name of the exact town. As had happened the day before, Volk indicated that Green was free to leave, but as Green was walking back to the driver's door, Volk again asked if he could search Green's vehicle. This time, Green apologized and declined, explaining that he was in too much of a hurry. Volk then instructed Green to wait in his car until further notice.

---

[1] The record does not reveal why Volk chose not to wait any longer for backup.

After approximately fifteen minutes, during which there was no meaningful interaction between Volk and Green, a canine unit arrived. Green was taken out of his vehicle and told to take his dog with him to a safe distance away from the police dog.[2] A canine sweep of the car resulted in an alert for drugs in the trunk. Based on this evidence, Volk obtained a search warrant a few hours later. A search of Green's trunk revealed a duffel bag containing roughly 1,000 bricks of heroin weighing nearly 20 pounds.

## B. Procedural History

Green was charged with possession with intent to distribute one kilogram or more of heroin. Green filed a motion to suppress the heroin as obtained in violation of the Fourth Amendment. The District Court held an evidentiary hearing nearly three years after the original stop, in which Volk testified as the only witness. After the District Court denied Green's motion, he pled guilty to the single count, preserving the constitutional issues for appeal. Green was sentenced to 120 months of imprisonment—the mandatory minimum—followed by five years of supervised release.

## II

The District Court exercised jurisdiction under 28 U.S.C. § 3231, and this Court exercises jurisdiction under 28 U.S.C. § 1291. On an appeal of a denial of a motion to suppress, the District Court's factual findings are reviewed for clear error and its legal determinations are subject to

---

[2] At this point, Volk performed a patdown of Green. Green's claim that this patdown was unconstitutional is without merit. *See United States v. Murray*, 821 F.3d 386, 393 (3d Cir. 2016) (holding that a suspect's connection with drug dealing supports reasonable suspicion that he is armed and dangerous).

plenary review. *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012). We will affirm the District Court's denial of Green's motion to suppress. Although our reasoning differs in some respects from that of the District Court, we may affirm on any ground supported by the record. *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).

III

Green's constitutional claims require us to answer several discrete questions. First, we must assess whether the District Court erred when it ruled that the final traffic stop on April 5 was supported by reasonable suspicion of a traffic violation. If there was no error, we must proceed to determine whether the District Court was also correct in its determination that the stop was conducted in a constitutional manner. Green argues that the stop was prolonged in violation of the Fourth Amendment. To address this claim, we must first decide when the stop was extended, and then determine whether, at that point, the extension was justified by a reasonable suspicion of criminal activity.

A. Initiation of the Traffic Stop

We turn first to Green's contention that the April 5 stop was initiated in violation of the Fourth Amendment. Traffic stops are classified as a type of *Terry* stop, and may be initiated based on a reasonable suspicion that a traffic violation has occurred. *Navarette v. California*, 134 S. Ct. 1683, 1686 (2014); *see United States v. Delfin-Colina*, 464 F.3d 392, 396–97 (3d Cir. 2006) (adopting reasonable suspicion, not probable cause, as the applicable standard). Here, Volk paced Green's vehicle in compliance with the relevant Pennsylvania statute and estimated his speed at 79 miles per hour, 14 miles per hour above the posted limit. Conceding these facts, Green nonetheless argues that the distance at which Volk conducted the pacing—between one

8

and two-tenths of a mile—was too great to allow for a reliable estimate of Green's speed. We disagree.

When pacing, the key requirement is maintaining a consistent distance with the target vehicle. At the suppression hearing, Volk testified that he was able to maintain a constant interval between himself and Green. The District Court found that Green's vehicle was some distance from Volk's, but not so far that Volk would have been unable to determine if the interval between the two was increasing, decreasing, or remaining constant. The dashboard camera footage from Volk's cruiser shows that this factual finding is not clearly erroneous. Our confidence in Volk's assessment is further supported by the fact that Green was traveling significantly faster than the speed limit allowed. Logically, the more excessive a driver's speed, the less precise a measurement must be to establish reasonable suspicion that the driver is speeding at least to some degree. *See United States v. Sowards*, 690 F.3d 583, 591–92 (4th Cir. 2012). The operative question is whether Volk had a reasonable suspicion that Green was speeding, not whether Volk could determine Green's exact speed. The District Court did not err in concluding that Volk had a reasonable suspicion that Green was speeding, so the stop was justified.[3]

B. Extension of the Traffic Stop

We next consider whether the April 5 traffic stop, though "lawful at its inception," was unreasonably extended

---

[3] Green's argument that the stop was pretextual is both true and immaterial. It has long been axiomatic that "a traffic-violation arrest . . . [is not] rendered invalid by the fact that it was 'a mere pretext for a narcotics search.'" *Whren v. United States*, 517 U.S. 806, 812–13 (1996) (quoting *United States v. Robinson*, 414 U.S. 218, 221 n.1 (1973)).

in violation of the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes. *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). There is no dispute that the April 5 traffic stop was extended to facilitate a canine sniff for drugs. What is disputed, however, is when this extension occurred, and whether, at that moment, Volk possessed reasonable suspicion in order to justify the extension. In light of *Rodriguez*, we must first determine when the stop was "measurably extend[ed]." *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). After determining when the stop was extended—the "*Rodriguez* moment," so to speak—we can assess whether the facts available to Volk at that time were sufficient to establish reasonable suspicion that Green was involved in drug trafficking.

As subsequent cases in our sister Circuits have demonstrated, the *Rodriguez* rule is far easier to articulate than to apply, and we now find ourselves facing a similar difficulty. We ultimately conclude that *Rodriguez* does not provide a clear answer for pinpointing the April 5 "*Rodriguez* moment." In light of such uncertainty—and solicitous of Green's Fourth Amendment rights—we will err on the side of caution and assume the earlier of the two plausible "*Rodriguez* moments" from which to assess reasonable suspicion. Because Volk did indeed possess reasonable suspicion at this earlier point, Green suffered no constitutional injury in the course of the traffic stop.

### The *Rodriguez* Decision

Prior to *Rodriguez*, the Supreme Court held in *Caballes* that a "dog sniff conducted during a . . . lawful traffic stop" does not violate the Fourth Amendment as long

10

as the sniff does not result in the stop being "prolonged beyond the time reasonably required to complete" its traffic-based mission. 543 U.S. at 410, 407. Following *Caballes*, lower courts disagreed over whether a *de minimis* extension of a traffic stop to allow time for a sniff would pass constitutional muster. *Rodriguez*, 135 S. Ct. at 1614 (comparing cases). *Rodriguez* answered this question with a clear "no," holding that, absent reasonable suspicion, any "unrelated inquiries [that] measurably extend the duration of [a] stop" are unlawful. *Id.* at 1615 (alterations added and omitted) (quoting *Johnson*, 555 U.S. at 333). In describing what inquiries qualify as "unrelated," *Rodriguez* drew a distinction between "ordinary inquiries incident to" a traffic stop, *id.* (quoting *Caballes*, 543 U.S. at 408), which serve the purpose of enforcing the traffic code, and other measures aimed at detecting criminal activity more generally. Actions like "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are in the former category of inquiries incident to a traffic stop. *Id.* A dog sniff, being obviously focused on the enforcement of drug—not traffic—laws, falls in the latter category and cannot, therefore, be performed in a manner that extends the duration of the stop absent reasonable suspicion. *Id.*

The task of determining when a traffic stop is "measurably extended" is more difficult than *Rodriguez*'s language might suggest. This difficulty stems, at least in part, from the particular facts of both *Caballes* and *Rodriguez*. In *Caballes*, the trooper making the stop radioed dispatch to report his actions. This transmission happened to be overheard by a drug interdiction officer, who immediately traveled to the scene and conducted the dog sniff before any citation had been issued. *Caballes*, 543 U.S. at 406. In

11

*Rodriguez*, by contrast, the officer who initiated the stop already had a drug dog in his vehicle. 135 S. Ct. at 1612. For safety reasons, however, he issued a warning for speeding and then waited for backup to arrive before conducting the dog sniff. *Id.* at 1613. The Court declared the former stop constitutional and the latter not. Neither case directly addressed what pre-citation conduct might constitute an impermissible extension.

Justice Alito, dissenting in *Rodriguez*, criticized the Court's decision as "impractical[] and arbitrary," and lamented that the constitutional question appeared to turn, "not [on] the length of the stop, but simply . . . the sequence in which [the officer] chose to perform his tasks." 135 S. Ct. at 1623, 1624 (Alito, J., dissenting). The majority disclaimed this reading of its opinion, stating that "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop'" *Id.* at 1616 (majority opinion). On this "critical question," however, *Rodriguez*'s language can be interpreted in a variety of ways. *Id.* In describing an extension as anything that "adds time to," *id.*, or "measurably extend[s]," *id.* at 1615, a stop, the Court seems to imply that nearly anything an officer does outside the valid, traffic-based inquiries will be unconstitutional. Yet, other language in the opinion suggests a more forgiving approach toward non-traffic-based actions. This ambiguity is brought to the fore with a pair of adjoining sentences: "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop . . . ." *Id.* (citation omitted). Left unexplained is how a police officer could possibly perform multiple tasks simultaneously without adding any time to a stop. While the majority makes clear that, contra Justice

12

Alito, sequence is not dispositive, *id.* at 1616, *Rodriguez* provides less clarity regarding what exactly is dispositive when evaluating an officer's pre-citation conduct.

In a more general sense, Justice Alito's concern was that the Court's attempt to craft a clear rule—no measurable extensions—was impractical in light of the factual complexity inherent in traffic stops. *Id.* at 1625 (Alito, J., dissenting). For this reason, Justice Alito favored a more flexible reasonableness standard to better account for the practical realities of traffic stops, and warned that the Court's ruling would invite arbitrary and unpredictable results. *Id.* at 1624. A survey of post-*Rodriguez* appellate decisions reveals that Justice Alito's concerns were prophetic. The *Rodriguez* rule, though clear in its formulation, has proved less precise where the rubber meets the road.

*Post-Rodriguez Decisions*

In several recent decisions, our sister Circuits have adopted starkly divergent interpretations of *Rodriguez*. Several have applied *Rodriguez*'s language quite rigidly, holding that any diversion from a stop's traffic-based mission is unlawful absent reasonable suspicion. In *United States v. Gomez*, for example, an officer stopped a vehicle for speeding and running red lights. 877 F.3d 76, 82 (2d Cir. 2017). When the officer first approached the vehicle, the driver asked the officer why he had been stopped, and the officer responded that he was conducting a heroin investigation and that he had observed the driver commit numerous traffic violations. *Id.* The Second Circuit determined that, by referencing the drug investigation, the officer unconstitutionally detoured from the traffic-based mission of the stop "[f]rom the moment" the conversation began. *Id.* at 91. In *United States v. Evans*, an officer initiated a traffic stop and conducted a vehicle records check, a license check, and an outstanding warrants check, all

of which came back clean. 786 F.3d 779, 782–83 (9th Cir. 2015). One of these checks, however, revealed that the stopped driver had a felony record. *Id.* at 783. Accordingly, the officer requested a check to verify that the driver was properly registered at the address that he had provided. *Id.* The Ninth Circuit ruled that, while the first two checks were permissible, the ex-felon registration check, not being directly relevant to the traffic stop, unconstitutionally extended the stop under *Rodriguez*. *Id.* at 786.

Other Circuits have applied *Rodriguez* more leniently, evaluating police actions by something more akin to a reasonableness standard. In *United States v. Collazo*, the Sixth Circuit found no constitutional violation because "most of the questions" asked by the officer were related to the traffic stop, "and none of them extended the traffic stop beyond a reasonable time." 818 F.3d 247, 257–58 (6th Cir. 2016) (citing *Rodriguez*, 135 S. Ct. at 1615), *cert. denied*, 137 S. Ct. 169 (2016). More categorically, the Seventh Circuit held in *United States v. Walton* that "[i]t was permissible for [the sole officer on-scene] to ask [the driver and passenger] questions unrelated to the traffic violations," 827 F.3d 682,

14

687 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 407 (2016), which undoubtedly extended the stop.[4]

As these examples demonstrate, *Caballes* and *Rodriguez* are difficult to apply beyond their facts, which has resulted in inconsistent application in the lower courts. Where, as in the present case, an officer arguably prolongs a traffic stop before issuing a citation, these precedents serve as an uncertain guide. What we know is that an officer may "conduct certain unrelated checks," but not "in a way that prolongs the stop." *Rodriguez*, 135 S. Ct. at 1615.

### *Applying Rodriguez*

This case presents many of the same ambiguities highlighted above. There can be no doubt that Volk measurably extended the traffic stop when, after issuing Green a warning citation, he instructed Green to wait in his car indefinitely. The key question is whether the stop was measurably extended at an earlier point—that is, whether the "*Rodriguez* moment" instead occurred when Volk returned to his vehicle after his brief initial conversation with Green and made an unrelated phone call to his colleague. If it did, then nothing later in the stop can inform our reasonable suspicion

---

[4] Even in traffic stop cases where courts have found no Fourth Amendment violations, several dissenting opinions have voiced the more restrictive interpretation of *Rodriguez*. *See United States v. Murillo-Salgado*, 854 F.3d 407, 419 (8th Cir. 2017) (Kelly, J., dissenting) (arguing that "even brief[]" questioning unrelated to the traffic stop must be supported by reasonable suspicion); *United States v. Hill*, 852 F.3d 377, 385 (4th Cir. 2017) (Davis, J., dissenting) (arguing that "every minute" an officer spent seeking to confirm a passenger's identity unreasonably prolonged the traffic stop).

15

analysis. This includes, most significantly, the conversation that occurred when Volk issued the citation to Green.

Under a restrictive reading of *Rodriguez*, it seems clear that Volk's actions following the initial conversation with Green, particularly the phone call to his colleague, added time to the traffic stop and constituted an extension. *See Gomez*, 877 F.3d at 90–91. This phone call was focused on Volk's suspicions about drug trafficking, not speeding. At the suppression hearing, Volk conceded that, by the time he made this call, he was intent on searching Green's vehicle and no longer concerned with the moving violation.[5]

On the other hand, there are sound reasons in favor of the more lenient approach followed by several Circuits. To start, this short phone call, though unrelated to the traffic stop, was not shown to have measurably prolonged the stop, which took little more than ten minutes from its inception to the issuance of the warning. Other courts have found that phone calls requesting canine assistance are not measurable extensions, *United States v. Hill*, 852 F.3d 377, 384 (4th Cir. 2017), though this conclusion is far from obvious under the reasoning of *Rodriguez*. Additionally, at the time Volk made the phone call he was apparently still waiting for backup,

---

[5] When asked about this portion of the stop, Volk testified as follows:

Q. At this point you are focused on "I am searching this car, right?"
A. I would like to, yes.
Q. This is not a moment about giving a warning for a speeding ticket, right?
A. Correct.

App. 193.

which raises its own set of considerations. *Rodriguez* acknowledged the danger to police officers inherent in traffic stops, and found no constitutional injury where an officer takes "negligibly burdensome precautions in order to complete his [traffic] mission safely." 135 S. Ct. at 1616. By contrast, "safety precautions taken in order to facilitate" investigation of other crimes are not justified as part of a routine traffic stop. *Id.* Assuming Volk's request for backup was motivated by safety concerns inherent to the traffic stop, then any actions taken while waiting for backup to arrive, including the phone call, did not add to the "time reasonably required to complete the mission." *Id.* at 1615 (alteration omitted) (quoting *Caballes*, 543 U.S. at 407). *Rodriguez* would seem to suggest that the validity of Volk waiting for backup turns on his motivation for making the request—traffic-based or otherwise—but even this inquiry strikes us as rather arbitrary. We doubt very much that Volk's motivation can be distilled to a single concern rather than a hazy constellation of factors confronting an officer in such a situation. Of course, Volk ultimately chose not to wait for backup to arrive before reengaging with Green, which adds still greater complexity to the analysis.

In light of the uncertainty in applying *Rodriguez* to the present facts, we believe that the prudent course is to err on the side of caution and proceed on the assumption—not conclusion—that the "*Rodriguez* moment" occurred immediately after Volk's initial conversation with Green. Accordingly, we will assess reasonable suspicion based only on the facts known to Volk at that time. Because we conclude that Volk did possess reasonable suspicion at this moment, there will be no need to address the possible implications of a later "*Rodriguez* moment."

17

## C. Reasonable Suspicion

We now ask whether, at our assumed "*Rodriguez moment*," Volk possessed reasonable suspicion of criminal activity. In speaking of reasonable suspicion, our precedents describe more than define the term, which the Supreme Court has characterized as an "elusive concept." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Reasonable suspicion is more than "a mere hunch . . . [but] considerably less than . . . a preponderance of the evidence, and obviously less than . . . probable cause." *Navarette*, 134 S. Ct. at 1687 (internal quotation marks and citations omitted) (quoting *Cortez*, 449 U.S. at 417; and *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Reasonable suspicion requires only "'a particularized and objective basis' for suspecting . . . criminal activity," *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quoting *Cortez*, 449 U.S. at 417–418), and should not be derived from characteristics common to the "vast majority of innocent" individuals, *Karnes v. Skrutski*, 62 F.3d 485, 494 (3d Cir. 1995).

In applying this standard, courts invoke several common themes. First, reasonable suspicion must always be evaluated under the totality of the circumstances. *Cortez*, 449 U.S. at 417. Accordingly, courts have consistently refused to adopt per se rules declaring a particular factor sufficient or insufficient to establish reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 126–27 (Stevens, J., dissenting) (agreeing with the Court's rejection of a per se rule regarding flight from police). Second, when assessing the totality of the circumstances, courts recognize the particular ability of law enforcement officers, based on training and experience, "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273

(2002) (quoting *Cortez*, 449 U.S. at 418). Third, and consistent with the totality of the circumstances approach, reasonable suspicion cannot be defeated by a so-called "divide-and-conquer" analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). In *Terry* itself, the Court found there was reasonable suspicion to justify the temporary seizures even though each factor relied on by the officer, viewed in isolation, might have seemed perfectly innocent. *Arvizu*, 534 U.S. at 274 (citing *Terry*, 392 U.S. at 22).

### *The Prior Stop and Search*

Applying this standard to the present case, our first challenge is determining the constitutional significance of the first encounter between Green and Volk on April 4. During that stop, Green consented to a search of his vehicle, which failed to uncover any contraband. The Government argues that the unsuccessful nature of the April 4 search is essentially irrelevant to the question of reasonable suspicion on April 5. Green counters that, because he consented to the April 4 search and was found free of contraband, no information from the search could be used to support reasonable suspicion on April 5. Essentially, Green argues that the April 4 search gave him a clean slate moving forward. In support, Green cites *United States v. Peters*, 10 F.3d 1517 (10th Cir. 1993), which likewise included multiple traffic stops in relatively quick succession. The District Court, perhaps seeking to avoid this thorny issue, purported to conduct an independent analysis of the April 5 facts alone. In reality, however, the District Court's analysis incorporated several facts from the preceding two days. For instance, the District Court found Green's travel on April 5 to be

suspicious, but could have only reached this conclusion by relying on Green's April 4 statements about his travel plans.

The present case is easily distinguishable from *Peters*. There, an officer pulled over the defendant and his passenger for erratic driving in a rented moving truck. The officer suspected that Peters was transporting drugs, and received consent to search his truck. This search failed to uncover any contraband and the officer sent Peters on his way. Concerned that his search had been inadequate, the officer radioed his headquarters about the situation. This led to Peters again being pulled over a few hours down the road, at which point a different officer uncovered evidence that Peters was present in the country illegally. The Tenth Circuit ruled that this evidence should have been suppressed because the second stop was unconstitutionally premised on the same factors that justified the initial stop. *Id.* at 1522–23.

In Green's case, roughly twenty-six hours elapsed between the two traffic stops, as opposed to the four or five hour interval in *Peters*. In addition, the nature of Green's suspected crime—drug trafficking—made it entirely plausible for Green to have acquired drugs during the intervening time period. In *Peters*, by contrast, the officers all but knew that the suspect had driven uninterrupted between the two traffic stops. *Id.* at 1520. In fact, they relied on this assumption to predict Peters' location for the second stop. *Id.* Those officers could not have reasonably suspected that Peters acquired contraband between the two stops. Nor was that the point; the second search was simply a redo of the first. Finally, in *Peters* there was no independent basis for making the second traffic stop. *Id.* at 1523. Here, Green's speeding provided a legitimate justification for the April 5 stop.

Given these substantial differences, we see no reason—constitutional or otherwise—to follow *Peters* and

exclude from our analysis information gained during the April 4 stop. It bears repeating: reasonable suspicion is based on the totality of the circumstances, i.e., "the whole picture." *Cortez*, 449 U.S. at 417. Categorically excluding a large swath of evidence is quite the opposite of considering "the whole picture." Incidentally, this case illustrates that the totality of the circumstances approach does not inherently benefit either side. For instance, although our analysis appropriately considers the fact that Volk detected the smell of raw marijuana emanating from Green's trunk on April 4, we also consider as strong evidence the fact that Green's vehicle was searched and contained no contraband. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness' . . . ." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam)). In our view, a reasonable officer in Volk's position, rather than excluding certain evidence, would consider all of the facts available to him and accord each its due weight. In evaluating his actions, the Constitution requires that we do likewise.

*Reasonable Suspicion Factors*

As noted above, when evaluating reasonable suspicion a court's task is to assess the situation as a whole. Nevertheless, in explaining our analysis it will often be beneficial, for the sake of clarity, to explain each factor's relative weight in establishing reasonable suspicion. In accordance with our *Rodriguez* analysis, we will only consider those facts known to Volk at the time he completed his conversation with Green at the beginning of the April 5 stop. We conclude that Volk possessed a reasonable suspicion that Green was engaged in criminal activity. This conclusion is based on three primary factors: (1) Green's misleading

21

statements regarding his travel, (2) the smell of marijuana in Green's trunk, and (3) Green's criminal history.[6]

1. Green's Misleading Statements

Shortly after being stopped on April 4, Green related to Volk that he was traveling to Philadelphia to visit family. Volk asked Green how long he was staying, to which Green responded, "I don't know. That all depends." Volk immediately began to laugh and, speaking over Green, asked "You don't have to get back for work or anything?" Green responded that he was a barber, so his hours were fairly flexible. Roughly twenty-six hours later, Volk pulled Green over again as he returned from Philadelphia to Pittsburgh. Based on these facts, the District Court concluded that Green's statements "about his travels to Philadelphia were inconsistent and contradictory," and thus contributed to Volk's reasonable suspicion.

As an initial matter, we note that nothing in Green's statement to Volk on April 4 was logically inconsistent with his April 5 return. Green's statement indicated that his trip was for an indeterminate length of time, which obviously does not foreclose a one-day turnaround. Contradictory or inconsistent statements may contribute to reasonable suspicion, *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003), but an incomplete statement is not necessarily contradictory or inconsistent. For all we know, Green's complete, uninterrupted statement would have been, "I don't know. That all depends. Probably tomorrow, but maybe the next day." The fact that Green did not provide a full statement

---

[6] Because these factors were sufficient to establish reasonable suspicion, we will not analyze what, if any, inferences could be drawn from the dog in Green's car.

22

about his travel plans limits, but does not defeat, our reliance on this factor.

Though not strictly contradictory, Green's statements concerning his travel were sufficiently confusing so as to meaningfully contribute to reasonable suspicion. While not logically irreconcilable with his earlier statement, Green's travel was nonetheless suspicious. *See United States v. Benoit*, 730 F.3d 280, 285–86 (3d Cir. 2013) (premising reasonable suspicion on inconsistent statements regarding the purpose and destination of voyage). In the context of a cross-state trip to visit family for the first time in a while, the answer "I don't know. That all depends," is not how someone would normally characterize the duration of a trip that could possibly last only a few hours. More to the point, we cannot say that Volk was unreasonable in believing that Green's April 4 statement was at least in tension with an April 5 return.

In our mind, however, the more significant suspicion arose, not from Green's quick turnaround, but his own statements on April 5. While Green was looking for his license and registration at the beginning of the April 5 stop, Volk asked him how he was doing and Green replied, "I can't complain. I got a dog, so." Only after Volk alluded to their conversation the day before—"I thought you were staying out a couple days?"—did Green say he needed to rush back to Pittsburgh because of his daughter's broken leg.[7] Volk was justified in viewing Green's shifting statements with mounting skepticism. If it was true that Green's family visit

---

[7] The fact that Green did not challenge Volk's presumption regarding the intended duration of his trip further mitigates our concern over Volk interrupting Green on April 4.

23

had been cut short due to his daughter suffering a serious injury, it is hard to imagine him responding to Volk's question—"How are you?"—with such a blasé answer—"I can't complain. I got a dog, so." Moreover, Green had already been informed that he was stopped for speeding, so it is highly suspicious that he would not immediately offer his daughter's purported injury as an explanation for his rushing home. Instead, Green's initial explanation for speeding was simply that he had left his cruise control on while going down a hill. Green's puzzling responses provided a reasonable basis to believe that he was lying about his travels and contributed to Volk's reasonable suspicion of illegal activity.

2. The Smell of Marijuana

During the consensual search of Green's car on April 4, Volk detected the smell of raw marijuana in the trunk. Volk was unable to locate the source of the smell, and the car was otherwise free of contraband. "It is well settled that the smell of marijuana alone . . . may establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006). Green, however, argues that the unsuccessful search on April 4 eliminated any probative value of the odor. We disagree. While the fact that no marijuana was found on April 4 is certainly a relevant consideration, it does not preclude our—or Volk's—consideration of this evidence in support of reasonable suspicion on April 5.

The odor of marijuana in a car "can 'be evidence of the most persuasive character,'" *Wesby*, 138 S. Ct. at 586 n.5 (quoting *Johnson v. United States*, 333 U.S. 10, 13 (1948)), and is not an attribute shared by "a very large category of presumably innocent travelers," *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam). The absence of actual marijuana on April 4 mitigates, but does not eliminate, the

probative value of this evidence.[8] We agree with the reasoning in *Peters* that, having conducted a prior search, the officer could not justify a subsequent search absent additional evidence. 10 F.3d at 1522–23. But here, the April 5 stop was independently justified and there was additional evidence to support reasonable suspicion. In this context, we find no basis in law or logic to prohibit consideration of the marijuana odor merely because Green was not transporting drugs the day before. Reasonable suspicion must be grounded in "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949). The smell of marijuana is one such "practical consideration" familiar to an officer with Volk's experience in the field. The Fourth Amendment does not demand the kind of cognitive contortions that would be required for Volk to ignore highly probative evidence of drug activity in deciding whether he had reasonable suspicion to extend the stop. Volk was

---

[8] Our analysis would be different if, for example, Volk had seen something he believed to be marijuana but turned out to be some other leafy substance. *See Karnes*, 62 F.3d at 496. In that situation, later investigation would have "exhausted" the validity of the earlier suspicion. *Peters*, 10 F.3d at 1522. Here, the smell of marijuana suggested that Green had recently transported drugs. The absence of drugs at any particular moment in no way foreclosed this inference.

justified in relying on this odor as evidence of criminal activity on April 5.[9]

### 3. Green's Criminal History

During the April 4 stop, Volk conducted a records check and discovered that Green had multiple prior arrests for drug and firearm violations. Volk did not learn how those arrests were ultimately resolved or whether Green had any convictions. Though a criminal record, much less an arrest record, is not sufficient to establish reasonable suspicion, it is a valid factor. *United States v. Mathurin*, 561 F.3d 170, 177 (3d Cir. 2009). As we have previously noted, "the use of prior arrests and convictions to aid in establishing probable cause is not only permissible, but is often helpful." *United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993) (citations omitted) (collecting cases). This utility is enhanced when the prior offenses relate to the crime being investigated. *Id.* Particularly given the other factors already discussed, Volk was amply justified in considering Green's drug arrests in assessing reasonable suspicion of drug trafficking on April 5.

### IV

---

[9] Following oral argument, Green brought to our attention a study raising questions about the reliability of individuals' ability to detect marijuana based on odor. Appellant Letter of Oct. 30, 2017 (citing Richard L. Doty, Thomas Wudarski, David A. Marshall and Lloyd Hasting, *Marijuana Odor Perception: Studies Modeled From Probable Cause Cases*, 28 Law and Human Behavior 223, 224 (2004)). While interesting, the study's tentative conclusions do not provide a sufficient basis for us to overturn the District Court's factual finding that "a smell of raw marijuana was emanating from the trunk area" of Green's car. App. 8.

Stepping back from these individual factors and considering the "whole picture," our question remains a fairly straight forward one. After the conversation at the start of the April 5 traffic stop, did Volk possess reasonable suspicion that Green was engaged in criminal activity? At that moment, Volk reasonably believed that Green had provided several misleading statements about his travel, he knew that Green's trunk carried the odor of marijuana, and he knew that Green had several prior arrests for drug and firearm violations. This evidence of criminal activity was tempered by the fact that, only one day prior, Green consented to a search of his vehicle, which was found free of contraband. Reasonable minds may disagree over the extent to which the results of this search counteracted the various indicia of criminality, but that is precisely the point. Whatever the effect of the prior search, it was not so sanitizing as to make Volk's suspicion of Green the following day unreasonable. We conclude that Volk had a "particularized and objective" basis for suspecting that Green was engaged in criminal activity on April 5, *Cortez*, 449 U.S. at 417, so extending the traffic stop to facilitate a dog sniff was permissible, *Rodriguez*, 135 S. Ct. at 1615.

For the reasons explained above, we will affirm the decision of the District Court.