**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3028

UNITED STATES OF AMERICA

v.

MIGUEL GONZALEZ SEGOVIA,
                                        Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-18-cr-00558-001)
District Judge: Honorable Joseph F. Leeson, Junior
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 1, 2021

Before: HARDIMAN, PHIPPS, and COWEN, *Circuit Judges*.

(Filed: June 11, 2021)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

HARDIMAN, *Circuit Judge*.

Miguel Gonzalez Segovia pleaded guilty to possession with intent to distribute cocaine, fentanyl, and acetylfentanyl, as well as aiding and abetting, in violation of federal law. He reserved the right to file this appeal challenging the District Court's order denying his motion to suppress evidence obtained in a traffic stop. We will affirm.

I

In November 2018, Gonzalez Segovia was driving eastbound on Interstate 78 in a black Ford Expedition when he was stopped by Pennsylvania State Trooper John Stepanski. After following Gonzalez Segovia for several minutes and seeing him drive too closely to a large commercial truck, Trooper Stepanski initiated the stop at mile marker 72.2 in Northampton County. After Stepanski activated his overhead lights, Gonzalez Segovia did not pull over immediately, continuing for a time before stopping on a bridge. For safety reasons, Stepanski ordered the vehicle to move off the bridge and Gonzalez Segovia did so after a relatively brief delay. On the roadside, Stepanski identified himself as state police; requested Gonzalez Segovia's driver's license, registration, and insurance; stated that the conversation was being recorded; and explained the traffic infraction. Stepanski later testified that Gonzalez Segovia was so nervous that as he presented his driver's license he had to drop his elbow onto the vehicle's center console to stop shaking.

When Stepanski asked Gonzalez Segovia where he was coming from and where he was headed, Gonzalez Segovia responded "Ohio" and "New Jersey." Traffic Stop

2

Video at 11:30–45. But when Stepanski asked what part of New Jersey, Gonzalez Segovia replied "Brooklyn." *Id.* Stepanski pointed out that Brooklyn is in New York.

Stepanski then asked a series of questions about the purpose of Gonzalez Segovia's trip, such as what was going on in Brooklyn, who he was visiting, and his specific destination. Gonzalez Segovia said he was visiting a cousin but did not have the address—even in his GPS—yet he knew where he was going.

Stepanski continued asking questions and Gonzalez Segovia disclosed the name of his cousin and that the vehicle was rented. Gonzalez Segovia said he was from California and that he drove from California to Ohio but did not visit anyone in Ohio. Gonzalez Segovia also told Stepanski that he planned to stay in Brooklyn for a couple of days before returning to Ohio.

The questioning continued and Gonzalez Segovia stated, among other things, that he rented his vehicle in Ohio the day before and it was due back the next day. He also said that he worked for a moving company and had done a job in Ohio. As they spoke, Stepanski noticed at least six "fairly large" suitcases inside the vehicle. App. 83.

The questioning took a little over four minutes, after which Stepanski returned to his police vehicle to request backup and to run Gonzalez Segovia's license and vehicle plate through law enforcement databases. By that time, Stepanski "knew [he] wanted to search [Gonzalez Segovia's] vehicle." *Id.* at 85.

After the database check, Stepanski asked Gonzalez Segovia if he had any guns or knives (he did not); instructed him to exit his vehicle; and asked more questions by the roadside, including questions about Gonzalez Segovia's criminal history and the presence

3

of contraband in the car (Gonzalez Segovia responded there was none). Stepanski then sought and received Gonzalez Segovia's verbal permission to search the vehicle. The trooper quoted and paraphrased a "Waiver of Rights and Consent to Search" form and had Gonzalez sign it before the search. Traffic Stop Video at 28:27–29:31; *see* App. 274. Inside one of the suitcases in the car, Stepanski found several kilogram-sized packages of drugs, so he and another trooper arrested Gonzalez Segovia and had his vehicle towed to a police facility. The federal indictment, the denial of Gonzalez Segovia's motion to suppress, his conditional guilty plea, and this appeal followed.

II

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's factual findings for clear error and legal conclusions de novo. *United States v. Garner*, 961 F.3d 264, 269 (3d Cir. 2020). "Because the District Court denied the suppression motion, we view the facts in the light most favorable to the Government." *Id.*

III

Gonzalez Segovia argues that Trooper Stepanski violated his Fourth Amendment right to be free from unreasonable searches and seizures. He claims Stepanski: (1) lacked reasonable suspicion to pull him over; (2) unlawfully extended the stop; and (3) searched his car without valid consent.

A

The District Court did not err when it held that the initial traffic stop was lawful. An officer may initiate a traffic stop based on a "reasonable suspicion that a traffic

violation has occurred." *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018).

"Reasonable suspicion is more than a mere hunch but considerably less than a preponderance of the evidence," requiring "only a particularized and objective basis for suspecting criminal activity." *Id.* at 183 (cleaned up). "[W]hat matters is not what is in the mind of the officer making the stop but whether, given the particular circumstances, a reasonable officer could articulate sound reasons for it." *United States v. Yusuf*, 993 F.3d 167, 182 n.12 (3d Cir. 2021). And an officer's use of a traffic stop as a pretext for investigating other crimes is "irrelevant" to the legality of the decision to pull a driver over. *United States v. Wilson*, 960 F.3d 136, 145 (3d Cir. 2020).

As the District Court found, and video footage from Stepanski's dashboard camera confirms, a reasonable officer could think that Gonzalez Segovia followed the commercial truck too closely in violation of Pennsylvania law. *See* 75 PA. CONS. STAT. § 3310(a) ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway."). That was enough to justify the stop.

B

Gonzalez Segovia next claims that Stepanski unlawfully extended the traffic stop. So we ask whether, without reasonable suspicion of additional criminal activity, Stepanski measurably prolonged the stop beyond the time needed "to address the traffic violation . . . and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). First, we determine whether and when the stop was measurably extended. *Green*, 897 F.3d at 179. If the stop was measurably extended, we assess

whether the facts available to the officer at the time of the extension were enough to establish reasonable suspicion that Gonzalez Segovia was involved in other crimes sufficient to justify the extension. *Id.*

i

Gonzalez Segovia argues that Stepanski "began his inquiry with a routine line of questioning but"—"[w]ithin roughly the first minute of [the] interaction"—turned to "a fishing expedition for other illegal activity." Gonzalez Segovia Br. at 29–30. The District Court disagreed, holding that Stepanski's first few minutes of questions were related to the traffic stop's mission and that the extension began, at the earliest, only after the officer returned to his vehicle and called for backup.

As we have noted, "some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop" and thus do not extend it. *Garner*, 961 F.3d at 271. In this case, Stepanski's initial questions about Gonzalez Segovia's comings and goings are in that category. Stepanski began to measurably extend the stop beyond the time needed to complete its traffic-related mission after Gonzalez Segovia said he was going to Brooklyn, New Jersey. Many of the officer's detailed follow up questions—*e.g.*, "what's going on in Brooklyn?" and "who are you visiting?—were not plausibly related to Gonzalez Segovia's traffic violation or officer safety. But that extension of the stop is unavailing to Gonzalez Segovia because Trooper Stepanski had reasonable suspicion that justified continuing the questioning and ultimately asking to search the vehicle. *See United States v. Bey*, 911 F.3d 139, 147 & n.44 (3d Cir. 2018) (an officer may use an investigative seizure of limited scope and duration to test a reasonable suspicion).

6

Stepanski was justified in initially extending the stop because Gonzalez Segovia: (1) was slow to pull over; (2) responded belatedly to the instruction to move forward past the bridge; (3) appeared "extremely nervous"; and (4) said he was going to Brooklyn right after saying he was headed to New Jersey. Together, these factors gave Stepanski grounds to inquire about Gonzalez Segovia's trip outside the scope of the traffic stop. And the answers to those questions heightened the reasonable suspicion: Gonzalez Segovia did not have the address of his destination; he inconsistently stated that he was going to Brooklyn for a couple of days but had to return his car to Ohio the next day; and he had much more luggage than one would expect given his allegedly short trip. These factors gave Stepanski cause to prolong the stop further and ask to search the vehicle, which led him to the drug-filled suitcases.

## C

Finally, we address Gonzalez Segovia's argument that he did not consent to Stepanski searching his car. To answer this question, we review "the totality of the circumstances." *United States v. Stabile*, 633 F.3d 219, 231 (3d Cir. 2011) (internal quotation marks and citations omitted). Relevant factors include "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *United States v. Williams*, 898 F.3d 323, 332 (3d Cir. 2018) (internal quotation marks and citation omitted).

The District Court's finding of consent was not clearly erroneous. Gonzalez Segovia argues that his consent was invalid because Stepanski: asked for consent while walking away from him; spoke quickly and animatedly while traffic "whizz[ed] by"; "held his hand on his firearm and was joined by his backup officer"; did not read the whole waiver of rights form; paraphrased some parts incorrectly; did not tell Gonzalez Segovia to read the whole form; made grammatical mistakes that would confuse a native Spanish speaker like Gonzalez Segovia; failed to ensure that Gonzalez Segovia filled out the entire form (which he did not); and neglected to inform him that the search would involve going through his luggage.

These points are unpersuasive. The District Court reasonably found that Stepanski addressed Gonzalez Segovia in a non-threatening manner and obtained verbal and written authorization to search the car, never receiving any indication that Gonzalez Segovia—who is fluent in English—did not understand what he was permitting or what Stepanski read to him. The District Court also pointed out that Stepanski did not brandish his firearm—the video shows that the trooper simply rested his hands on his belt, one hand on the gun, for a moment when Gonzalez Segovia was looking down and writing on the waiver form. The second officer walked over only after Gonzalez Segovia had started filling out the form. Finally, although Stepanski did not read the waiver form verbatim or in its entirety—and Gonzalez Segovia did not appear to read it fully himself—Stepanski "summarized the essential portions of the form and informed [Gonzalez Segovia] that he had the right to refuse the [search] request." App. 34. The District Court did not clearly err.

\*　　\*　　\*

For the reasons stated, we will affirm the judgment of conviction.