NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-1135
_____

UNITED STATES OF AMERICA

v.

WARREN MCALILEY,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 2-21-cr-00216-001)
District Judge: Hon. Eduardo C. Robreno

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
on March 28, 2024

Before: RESTREPO, MATEY, and McKEE, *Circuit Judges*

(Filed: October 15, 2024)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

RESTREPO, *Circuit Judge*

Appellant Warren McAliley appeals his conviction for possession of a firearm by a felon,[1] possession with intent to distribute 400 grams or more of fentanyl,[2] carrying a firearm during and in relation to a drug trafficking crime,[3] importation of drug paraphernalia,[4] attempt to manufacture controlled substances,[5] and importation of merchandise contrary to law.[6] For the reasons that follow, we will affirm.

I.

Law enforcement's investigation of McAliley began with Customs and Border Protection's (CBP) interception of a package labeled "silicon dioxide" that was shipped from China to Jerome Street in Philadelphia. Instead of silicon dioxide, however, the package contained Xylazine. Xylazine, though not a "controlled substance" under the Controlled Substances Act,[7] is a known cutting agent that is frequently mixed with narcotics and is only approved for use by veterinarians. *See* 21 C.F.R. § 522.2662(c). The Department of Homeland Security Investigations (HSI) conducted a controlled delivery of the package to the Jerome Street address and, along with the Pennsylvania State Police (PSP), surveilled the area for the next several hours.

---

[1] 18 U.S.C. §§ 922(g)(1), 924(e).
[2] 21 U.S.C. § 841(a)(1), (b)(1)(A).
[3] 18 U.S.C. § 924(c)(1).
[4] 21 U.S.C. §§ 863(a)(2)–(3).
[5] 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A).
[6] 18 U.S.C. § 545.
[7] *See* 21 U.S.C. § 812; *see also* 21 C.F.R. §§ 1308.11–1308.15.

2

Officers observed McAliley drive to the Jerome Street address in a Chevrolet Malibu, enter the house, and exit with the package. The officers then watched McAliley drive a few blocks and carry the package into a house on Kerbaugh Street. Officers later saw McAliley leave the house and engage in "countersurveillance" driving tactics on the way to pick up his girlfriend, Sharita Boykin. Later that afternoon, officers observed Boykin drive the Chevrolet Malibu around the block and park at a nearby store, while McAliley left from the back door of the Kerbaugh Street house, carrying a black duffel bag, walk through an alley, and get back into the Malibu in the store parking lot.

The officers enlisted Cody Simcox, a PSP officer who had not been part of the investigation up to that point, to create a "walled off stop."[8] Simcox pulled Boykin and McAliley over for traffic violations. During the stop, McAliley and Boykin gave inconsistent accounts of where they were driving from. In response to Simcox's questioning, McAliley also withheld information about recent arrests, which Simcox discovered through a PSP database search.

Simcox detained McAliley and Boykin and ordered a canine unit to the scene. A canine unit was not immediately available from PSP, but ninety minutes after the stop was initiated, a canine unit arrived and identified controlled substances in the car. Officers then searched the vehicle and black duffle bag, finding two kilograms of fentanyl, over sixty thousand dollars, a firearm, and cellular phones.

---

[8] The Government defines a "walled off stop" as "a law enforcement tactic used to apprehend a suspect or develop additional evidence in a case, without disclosing the ongoing investigation." Govt. Br. 14.

3

## II.

McAliley moved to suppress the physical evidence, arguing that Simcox did not have reasonable suspicion or probable cause to extend the traffic stop so that the canine unit had time to arrive. The District Court denied McAliley's motion to suppress, finding the police "had probable cause to believe [McAliley's] Chevrolet Malibu contained evidence of criminal activity." *United States v. McAliley*, No. 21-216, 2022 WL 760986, at *10 (E.D. Pa. Mar. 14, 2022). McAliley ultimately pleaded guilty to six charges and reserved his right to appeal the District Court's denial of his motion to suppress. This timely appeal followed.

## III.[9]

In reviewing the District Court's denial of a motion to suppress, we review its factual findings for clear error and exercise plenary review over its application of the law to those facts. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002). McAliley does not challenge the District Court's factual findings, only whether those facts established reasonable suspicion to justify extending the traffic stop for the dog sniff.

In arguing the traffic stop was unconstitutionally extended, McAliley asserts that Simcox must have developed reasonable suspicion during the stop itself; otherwise, any extension beyond what is necessary to complete the traffic stop is unlawful. This is an oversimplification of the facts and the law.

---

[9] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. amend. IV. A traffic stop must comply with the Fourth Amendment and may only be extended if supported by, at least, reasonable suspicion. *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018). "Reasonable suspicion requires only a particularized and objective basis for suspecting criminal activity." *Id.* at 183 (internal quotation marks and alterations omitted) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Where the police had probable cause to make an arrest before the traffic stop even began, however, they need not later develop reasonable suspicion to extend the stop. *See United States v. Burton*, 288 F.3d 91, 97–98 (3d Cir. 2002) (declining to determine whether *Terry* reasonable suspicion standard was met where police had probable cause to arrest defendant at beginning of stop). Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 103 (internal quotation marks and citation omitted).

Both reasonable suspicion and probable cause determinations are based on the "totality of the circumstances" and need not be limited to the traffic stop itself. *Green*, 897 F.3d at 183–84 (considering an officer's knowledge from a traffic stop of defendant the day before as part of totality of circumstances supporting reasonable suspicion to extend traffic stop of defendant the next day); *United States v. Silveus*, 542 F.3d 993, 1000 (3d Cir. 2008). Moreover, when an officer is part of a broader investigation, the "collective knowledge doctrine" applies, imputing the knowledge of all law enforcement officers on a team to the officer who actually seized and searched the investigated individual. *United States v. Whitfield*, 634 F.3d 741, 745–46 (3d Cir. 2010) (explaining

5

the "collective knowledge doctrine" applies to both reasonable suspicion and probable cause determinations).

McAliley does not contest that the collective knowledge doctrine applies here. He merely asserts that Simcox did not have independent reasonable suspicion to extend the stop. He disregards the hours of investigation that preceded the stop. That includes the knowledge of the HSI and PSP officers acquired through tracking the package of a known narcotics cutting agent, observing McAliley collect and transport that cutting agent and engage in countersurveillance measures to avoid being followed. The District Court correctly determined that Simcox had become part of that investigation, and as such, he shared the collective knowledge of the HSI and PSP officers.

This was not an ordinary traffic stop that began with an observed traffic violation. It was a walled-off stop intended to advance an ongoing narcotics investigation. McAliley relies on *Rodriguez v. United States* to argue the dog sniff impermissibly extended the traffic stop because it "prolonged [the stop] beyond the time reasonably required to complete the mission of issuing a . . . ticket." 575 U.S. 348, 350–51 (2015) (internal quotation marks and alterations omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). In *Rodriguez*, the purpose of the traffic stop was just that—a traffic stop resulting only from an observed traffic violation. *Id.* at 351. But here, the purpose of the traffic stop was to further the ongoing narcotics investigation "without putting the target on notice to destroy evidence or alert co-conspirators." Appellee Br. 14. And unlike *Rodriguez*, this stop did not begin with observed traffic violations. It began hours earlier with CBP's discovery of the Xylazine and continued through the HSI and PSP

6

surveillance.  We agree with the District Court that based on the totality of circumstances, including the narcotics investigation that preceded the stop, the Government had at least reasonable suspicion, if not probable cause, to extend the traffic stop to allow for a dog sniff.[10]

III.

For the foregoing reasons, we affirm the District Court's denial of McAliley's motion to suppress.

---

[10] In finding the officers had probable cause to stop and detain McAliley, the District Court noted the government's tracking of the Xylazine package, the location of the investigation and traffic stop as a high-crime area, McAliley's and Boykin's countersurveillance measures, and McAliley's inconsistent statements to Simcox during the traffic stop.