# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE )
)
v. )  I.D. # 1810014763,
)  1810014766,
JOHN MEDINA and )  1811001107
GRACE UMOFFIA, )
)
Defendants. )

Submitted: October 21, 2019
Decided: January 7, 2020

**Upon Defendants John Medina's and Grace Umoffia's Motions to Suppress:
DENIED**

This 7th day of January, 2020, upon consideration of the Motions to Suppress[1]

filed on behalf of Defendants John Medina and Grace Umoffia, the record in this

case, and the applicable legal authorities, it appears to the Court that:

## I. FACTUAL BACKGROUND

Defendants John Medina and Grace Umoffia each were indicted on two

counts of Identity Theft, five counts of Forgery Second Degree, two counts of Theft

Over $1500, Attempted Theft, and three counts of Conspiracy Second Degree.[2] The

---

[1] Defendants John Medina's and Grace Umoffia's original motions to suppress were filed on April 22, 2019 and April 29, 2019, respectively. The State's consolidated response was filed on May 17, 2019. A suppression hearing was held on May 24, 2019 and continued on June 13, 2019. The Court requested supplemental briefing, which was filed by Defendants on September 10, 2019 and the State on October 21, 2019.

[2] Umoffia also is charged with Hindering Prosecution. *State v. Grace Umoffia*, I.D. No. 1811001107 (Del. Super.).

charges arise from evidence discovered during a traffic stop in which Medina was the driver and Umoffia was the front seat passenger.[3]

The traffic stop at issue occurred on October 25, 2018 at approximately 9:00 p.m. Patrolman First Class Andrew Vari ("PFC Vari") of the Newark Police Department was on routine patrol in a marked police vehicle in Newark, Delaware. While in the vicinity of East Main Street, PFC Vari observed a gray Toyota Yaris with a New Jersey license plate exiting a parking space onto the street without its headlights illuminated. PFC Vari followed the vehicle because of the headlight issue.[4] The vehicle moved into a left turn lane and entered an intersection while the traffic light was red. The vehicle ultimately stopped in the intersection until the light turned green, and then completed the left turn still without its headlights illuminated. PFC Vari initiated the traffic stop, and the vehicle pulled to the side of the road along Academy Street.

PFC Vari observed what he believed to be two adult occupants in the vehicle, later identified as Defendant John Medina, the driver, and Defendant Grace Umoffia, the passenger. When asked for identification, Medina handed PFC Vari a degraded photocopy of an enlarged United Kingdom driver's license on an 8½ x 11 sheet of

---

[3] All facts are taken from the suppression hearing transcripts.
[4] Newark, Delaware Code of Ordinances Ch. 20, Art. XXVIII § 20-251 ("A person shall not operate an OHV during the period after sunset until sunrise without displaying a lighted headlight and lighted taillight.").

2

paper. The license identified the driver as Idris Frawn El-Bey from London, England. PFC Vari was not convinced Medina was the person in the photograph, as it only slightly resembled him. Medina was unable to produce a more legitimate form of identification. In response to PFC Vari's questioning, Medina told PFC Vari he was from the United Kingdom and in the United States for business. Medina also stated his sister rented the car from LaGuardia Airport. He advised PFC Vari he and Umoffia had driven to Wilmington from The Bronx to visit Umoffia's friends or family, and they stopped at California Pizza Kitchen and Roots for dinner. Medina was unable to tell PFC Vari where California Pizza Kitchen was located. PFC Vari then asked for Umoffia's identification, and she provided a New York driver's license.[5] At that point, PFC Vari returned to his vehicle.

PFC Vari began trying to confirm the driver's identity. He ran the name Idris Frawn El-Bey and the respective date of birth through DELJIS, which yielded no results. PFC Vari also ran multiple NCIC search variations, none of which proved successful. At some point after returning to his car and during the NCIC database search, he contacted Corporal Adam Stevens ("Cpl. Stevens"), a K9 officer, via cell phone to assist with the traffic stop. PFC Vari contacted Cpl. Stevens because of his

---

[5] Umoffia's identity later was confirmed. *See* Suppression Hearing Transcript (May 24, 2019) (hereinafter "May 24 Hearing Tr.") 27; Suppression Hearing Transcript (June 13, 2019) (hereinafter "June 13 Hearing Tr.") 64.

law enforcement and drug investigation experience. Cpl. Stevens was nearby and agreed to assist.

Cpl. Stevens arrived within a few minutes and pulled his vehicle behind PFC Vari's vehicle. PFC Vari updated Cpl. Stevens and asked him to speak with Medina and Umoffia. PFC Vari continued attempting to verify the driver's identity while Cpl. Stevens approached the vehicle and spoke with its occupants. Cpl. Stevens asked Medina to exit the vehicle so he could speak with him separately from Umoffia to identify any inconsistencies in their stories. Medina told Cpl. Stevens about his family history with the military, but Cpl. Stevens found Medina's answers to be hesitant and unusual. Medina told Cpl. Stevens the rental car agreement was in his sister's name, and Medina did not identify Umoffia as his sister. Cpl. Stevens testified that, in his experience, persons transporting currency, weapons, drugs, or other contraband often use rental vehicles because a rental vehicle cannot be seized for asset forfeiture if it is stopped by the police and drugs are found,.

Cpl. Stevens also spoke with Umoffia and asked about her family in the area. Umoffia responded that she did not have family, but rather a friend, in Wilmington. Medina's and Umoffia's responses regarding how long they had known each other differed wildly. At some point during the conversation, Cpl. Stevens asked if there were any "guns, drugs, dead bodies, that sort of thing" in the vehicle. Cpl. Stevens testified this is a standard question he always asks because some people are honest

in their response and he also can gauge their reaction to the question. Cpl. Stevens returned to PFC Vari's police vehicle and told him there were inconsistencies in the occupants' stories, including where they had eaten, the amount of time they had known each other, and Umoffia calling Medina something other than "Idris El-Bey."

After discussion with PFC Vari, Cpl. Stevens decided to conduct a dog sniff of the vehicle based on the information acquired up to that point: a rental vehicle where no one on the rental agreement was present; inconsistences in the occupants' stories regarding where they were coming from and where they were going; the driver's hesitance in answering questions that should have been straightforward; the photocopied United Kingdom driver's license; and the inability to confirm Medina's identity. Medina, who already was outside the vehicle, did not consent to the dog sniff. For officer and passenger safety, Cpl. Stevens asked Umoffia to exit the vehicle during the dog sniff. Umoffia left her front passenger door open when she exited the vehicle.

During the dog sniff, PFC Vari stood with Medina and Umoffia, effectively suspending his investigation into Medina's identity. Cpl. Stevens began an open-air sniff of the vehicle's exterior, which included making passes around the vehicle with Cpl. Steven's partner K9 Varg. Cpl. Stevens began by "detailing" for K9 Varg, which involves Stevens using his hand to direct K9 Varg to sniff areas of the vehicle where air can seep through and an odor may escape. Cpl. Stevens and K9 Varg

5

conducted two passes of the vehicle in one direction and then changed directions on the third pass. Cpl. Stevens testified that it is standard practice to pass in both directions because of wind direction, temperature, humidity, structural variations, etc.; and that he typically looks for significant changes in behavior within four passes. Significant changes in behavior could include mouth movements, breathing changes, a slow-down in movement, etc. K9 Varg exhibited significant changes in behavior (an "indication") at the front passenger door and the front driver's window. K9 Varg ultimately barked and "alerted"[6] to the scent of narcotics at the front passenger seat. During the fifth pass, K9 Varg entered the vehicle through the open front passenger door.

After K9 Varg alerted, Cpl. Stevens allowed K9 Varg back into the stopped vehicle where he scanned the inside and showed specific interest in the purse on the front passenger floorboard. Cpl. Stevens then conducted a hand search of the vehicle's interior. The purse contained $4,800 in cash. He also found multiple folders containing business documents located in the rear passenger compartment of the vehicle, including invoices for hundreds of thousands of dollars' worth of fine art, Delaware Superior Court documents, IRS documents, Prothonotary documents,

---

[6] Cpl. Stevens testified that K9 Varg typically will "alert" by sitting, but he could not physically sit down at this location because there was a high curb and a parking meter. Cpl. Stevens explained that when K9 Varg cannot physically sit down, he will freeze and then bark. *See* June 13 Hearing Tr. 120-24. "If it was in a controlled environment where it was a clear, unobstructed roadway, I believe my dog would have sat, yes." *Id.* at 126.

and banking documents all with various names and addresses. Medina claimed the documents belonged to his sister. Cpl. Stevens did not find drugs during the search.

After the dog sniff and the resulting search, PFC Vari contacted other experienced officers seeking assistance. PFC Vari called Detective Paul Lawrence, a DEA task force member, who ultimately was unable to assist. PFC Vari also contacted Sergeant Gregory D'Elia ("Sgt. D'Elia") seeking guidance about whether the evidence sparked terrorism-related concerns. Sgt. D'Elia testified that the name "El-Bey" commonly is used by sovereign citizens. Sgt. D'Elia contacted his supervisor at the FBI, James Markley, and asked him to have an analyst run the names through their databases to try to confirm Medina's identity. Sgt. D'Elia then proceeded to the traffic stop scene. The FBI database search ultimately yielded no results. PFC Vari additionally contacted Detective Anderson and Sergeant Michael Szep ("Sgt. Szep") to assist with the investigation.

Eventually, Corporal Morgan Fountain ("Cpl. Fountain") was contacted and conducted an Accurint search for the registered owner of the vehicle. The search yielded a result for a Juan and/or John Medina and listed physical characteristics matching the driver. Searching that name in the New York State Police database yielded a photograph matching the driver. Sgt. Szep made the ultimate decision to take Medina and Umoffia to the station. The parties stipulated that approximately

7

two hours passed between the time of the initial stop and when PFC Vari arrived back at the station.

## II. PARTIES' CONTENTIONS

Defendants Medina and Umoffia move to suppress all evidence seized as a result of the traffic stop. Medina and Umoffia make similar arguments challenging various stages of the traffic stop and investigation as exceeding their rights under the United States and Delaware Constitutions. Those challenges generally fall into the following categories: (1) whether the officers measurably extended the traffic stop; (2) if the stop measurably was extended, whether the officers had reasonable articulable suspicion to do so; (3) whether the canine sniff was valid; (4) whether the resulting vehicle search and the scope of that search was valid; and (5) whether the use of the documents and contacting additional officers to assist in identifying Medina was lawful. After considering the parties' arguments, I conclude the traffic stop measurably was extended by the dog sniff, but the officers had reasonable articulable suspicion to do so. Moreover, the dog sniff and resulting search were valid and the officers had a basis to look at and use the documents to try to identify Medina. The Defendants' Motions to Suppress therefore are denied.

## III. ANALYSIS

Generally, a defendant who moves to suppress evidence bears the burden of establishing the challenged search or seizure violated his Constitutional rights.[7] Where, as here, the basis for the motion is a warrantless search, the State bears the burden of providing the challenged search comported with the defendant's constitutional rights.[8]

### A. The initial traffic stop was justified at its inception.

The United States Constitution's Fourth and Fourteenth Amendments guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"[9] A person is considered to be "seized" when, in view of the surrounding circumstances, a reasonable person would not feel free to leave.[10] In the context of traffic stops, "courts have held that a stop is lawful where the officer has reasonable suspicion that either the motorist or the vehicle are in violation of the law."[11] "A police officer who observes a traffic

---

[7] *State v. Dollard*, 788 A.2d 1283, 1286 (Del. Super. 2001); *State v. McElderry*, 2018 WL 4771786, at *2 (Del. Super. Oct. 1, 2018) (quoting *State v. Nyala*, 2014 WL 3565989, at *5 (Del. Super. July 17, 2014)).

[8] *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001); *McElderry*, 2018 WL 4771786, at *2 (quoting *State v. Chandler*, 132 A.3d 133, 139 (corrected) (Del. Super. Apr. 14, 2015)).

[9] U.S. Const. amend. IV. Article I, § 6 of the Delaware Constitution contains a similar search and seizure provision that, at times, is broader than the protections afforded by the United States Constitution. For purposes of the issues raised in this Motion, the protections are identical.

[10] *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (citing *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980)); *State v. Huntley*, 777 A.2d 249, 254 (Del. Super. 2000).

[11] *U.S. v. Pierce*, 2009 WL 255627, at *3 (D. Del. Feb. 2, 2009) (citing *U.S. v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006)).

violation has probable cause to stop the vehicle and its driver."[12] Under the Fourth Amendment, a traffic stop constitutes a seizure of the vehicle as well as its occupants.[13]

Here, it is undisputed that the initial traffic stop for the headlight violation constituted a seizure of Medina and Umoffia, but that seizure was proper because PFC Vari possessed probable cause to stop the vehicle on the basis of the traffic violation. Defendants do not contest the validity of the initial traffic stop. They do, however, argue the initial traffic stop measurably was extended when the officers began pursuing an unrelated drug investigation.

## B. The initial traffic stop measurably was extended.

A traffic stop's permissible duration and execution necessarily is limited by the stop's initial purpose.[14] Any expanded inquiries into matters unrelated to the initial traffic stop only are valid if they do not measurably extend the stop's duration.[15] If a traffic stop goes beyond fulfilling its initial purpose and the stop

---

[12] *Holden v. State*, 23 A.3d 843, 847 (Del. 2011) (citing *Whren v. U.S.*, 517 U.S. 806, 810 (1996)); *State v. Bordley*, 2017 WL 2972174, at *2 (Del. Super. July 11, 2017).

[13] *Caldwell v. State*, 780 A.2d 1037, 1045 (Del. 2001). Umoffia, as a passenger, is considered to be seized as well as Medina, the driver. *See Brendlin v. California*, 551 U.S. 249, 251 (2007) (finding the driver as well as the passenger of a car are seized within the meaning of the Fourth Amendment during a traffic stop and may challenge the stop's constitutionality).

[14] *Caldwell*, 780 A.2d at 1047; *see Holden*, 23 A.3d at 847; *Bordley*, 2017 WL 2972174, at *2.

[15] *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as the inquiries do not **measurably extend** the duration of the stop.") (emphasis added). *Compare Cannon v. State*, 2018 WL 6575432, at *3 (Del. Dec. 12, 2018) (finding an officer asking a defendant to exit the vehicle during a valid traffic stop to explain a window tint violation did not measurably extend the stop), *and Loper v. State*, 8

10

measurably was extended, a second seizure has occurred that must be justified by independent facts equating to reasonable articulable suspicion of criminal activity.[16]

There is no clear consensus regarding what actions or inactions "measurably extend" a traffic stop. In *Rodriguez v U.S.*, the Supreme Court held that an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop[,]" but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."[17] The Court determined actions such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" all are valid inquiries that "serve the same objective as enforcement of the traffic code[.]"[18]

Defendants argue the initial traffic stop measurably was extended by PFC Vari calling Cpl. Stevens, Cpl. Stevens asking questions unrelated to the traffic violation,

---

A.3d 1169, 1174 (Del. 2010) (finding a person, already lawfully detained as a result of a valid traffic stop, is generally not seized a second time when ordered to leave his car, because his mobility is already validly limited), *with Chandler*, 132 A.3d at 143 (finding the officer asking whether there was any contraband in the vehicle measurably extended the traffic stop "into an investigative detention that exceeded the justifying purpose of the stop"), *Caldwell*, 780 A.2d at 1049 (a second seizure occurred when officers ordered the defendant to immediately exit his vehicle that was illegally parked in a fire lane after obtaining his license and registration information because the officer's actions exceeded the permissible scope of the initial traffic stop), *and State v. Stanley*, 2015 WL 9010669, at *4-5 (Del. Super. Dec. 9, 2015) (finding an officer may remove passengers from a vehicle for safety purposes; but if there are no safety concerns, this constitutes a measurable extension of the traffic stop).

[16] *Caldwell*, 780 A.2d at 1047; *Stanley*, 2015 WL 9010669, at *2.

[17] *Rodriguez v. U.S.*, 575 U.S. 348, 355 (2015).

[18] *Id.*

11

and the dog sniff of the vehicle.[19] For the reasons hereinafter stated, the Court finds that the initial traffic stop measurably was extended by the dog sniff, but that the officers had reasonable articulable suspicion to do so.

### 1. PFC Vari's initial questioning and attempts to confirm Medina's identity through various databases did not measurably extend the traffic stop.

A police officer may demand a seized person's name, identity, address, business abroad, and destination.[20] A police officer also may run the necessary background checks associated with conducting a traffic stop.[21] PFC Vari was within his authority to conduct the routine questioning associated with a traffic stop, including checking Medina's license and conducting checks through the various databases to confirm Medina's identity. The fact that this step took longer than it ordinarily might is explained by Medina's failure to provide an accurate name and/or valid identification. PFC Vari's efforts to confirm Medina's identity did not extend the stop beyond its initial purpose.

---

[19] Def. Grace Umoffia's Opening Br. in Supp. of Mot. to Suppress (hereinafter "Def. Umoffia's Suppl. Br.") 14.

[20] 11 *Del. C.* § 1902(a); *see Loper*, 8 A.3d at 1173 ("the police may question a passenger about his or her identity, and those questions are not beyond the scope of a reasonable investigation").

[21] *See Loper*, 8 A.3d at 1172-73 (finding questioning a passenger about their identity and running a background check within permissible scope of traffic stop); *State v. Dillard*, 2018 WL 1382394, at *3 (Del. Super. Mar. 16, 2018), *aff'd*, 207 A.3d 136 (Del. 2019) (finding questioning a driver and running a background check within permissible scope of traffic stop).

## 2. PFC Vari's phone call to Cpl. Stevens did not measurably extend the traffic stop.

Similarly, PFC Vari's phone call to Cpl. Stevens also did not measurably extend the initial traffic stop. Umoffia contends PFC Vari "almost immediately abandoned his traffic investigation" by calling Cpl. Stevens for assistance and waiting for him to arrive.[22] Umoffia argues PFC Vari called Cpl. Stevens "before he even finished running the occupants' names through the computer."[23] By calling Cpl. Stevens, Umoffia reasons, PFC Vari measurably extended the traffic stop, and the phone call constituted a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion.[24] The State argues the stop was not extended measurably by the call to Cpl. Stevens because "calling another officer for assistance is not unrelated to an investigation focused on identifying Medina, given that there [were] two individuals in the car."[25]

PFC Vari's phone call to Cpl. Stevens did not measurably extend the traffic stop. PFC Vari testified that Medina gave him an invalid identification, the photo on the identification only slightly resembled him, and he did not have a more reliable form of identification with him. PFC Vari called Cpl. Stevens for assistance because Cpl. Stevens had more experience as a police officer. Cpl. Stevens was nearby and

---

[22] Def. Umoffia's Suppl. Br. 7-8, 14.

[23] *Id.* at 7-8.

[24] *See id.*

[25] State's Resp. to Defs.' Opening Br. and Opening Mem. in Supp. of Mot. to Suppress (hereinafter "State's Suppl. Br.") 12.

arrived shortly after the call.[26] Therefore, PFC Vari's phone call to Cpl. Stevens did not measurably extend the stop or detour from its purpose, which necessarily included confirming Medina's identity.

### 3. Cpl. Stevens' additional questioning did not measurably extend the traffic stop.

Umoffia concedes it was lawful for Cpl. Stevens to ask follow up questions to confirm or dispel his suspicions.[27] Umoffia, however, argues Cpl. Stevens' question of whether there was anything illegal in the vehicle (such as human beings, guns, drugs, or dead bodies) was overly broad and not an acceptable part of routine traffic stop questioning. Umoffia contends this question "did not significantly prolong the stop, [but] 'for something to be measurable it need not be large . . . .'"[28]

"Although questions unrelated to the initial justification for the stop might not *per se* require reasonable suspicion or consent to further question, the Delaware Supreme Court has made clear that such inquiries must not measurably extend the duration of the stop."[29] In the context of this case, and particularly the nature of the officers' questioning and their inability to confirm Medina's identity, Cpl. Steven's question about contraband in the vehicle did not measurably extend the stop beyond its initial purpose. The Delaware Supreme Court reached a similar decision in *Pierce*

---

[26] May 24 Hearing. Tr. 31.

[27] Def. Grace Umoffia's Mot. to Suppress (hereinafter "Def. Umoffia's Mot. to Suppress") 6.

[28] Def. Umoffia's Suppl. Br. 15.

[29] *Chandler*, 132 A.3d at 143; *Murray v. State*, 45 A.3d 670, 675 (corrected) (Del. July 10, 2012) ("For something to be measurable, it need not be large[.]").

14

*v. State*, finding "an officer's question about whether there was any contraband in the vehicle during a traffic stop did not constitute a second investigative detention because the trial court found that it was a question the officer routinely asked as part of a traffic stop."[30]

Here, at the conclusion of Cpl. Steven's questioning, he asked Medina and Umoffia if there was "[a]nything illegal in the car: [h]uman beings, guns, drugs, dead bodies in the trunk[.]"[31] This specific question was asked during the initial questioning and before the dog sniff. Cpl. Stevens testified that he has asked that question during traffic stops throughout his 12-13 year career as a police officer when there is any kind of indicator "there might be something more than just a simple traffic stop."[32] Moreover, while Cpl. Stevens was questioning Medina and Umoffia, PFC Vari still was in his police vehicle trying to confirm Medina's identity. Accordingly, this question did not measurably extend the stop.[33]

---

[30] *Chandler*, 132 A.3d at 143 n.38 (citing *Pierce v. State*, 2011 WL 1631558 (Del. Apr. 29, 2011)) ("In *Pierce*, the officer asked the occupants of the vehicle if they had any contraband only a few minutes after the initial traffic stop and contemporaneously with other routine questions about the occupants' identification and travels. The occupants were still in the vehicle and the officer had not yet returned to his patrol vehicle to run routine computer checks.").

[31] June 13 Hearing Tr. 93.

[32] *Id.* at 93-94.

[33] Medina argues a seizure occurred when Cpl. Stevens ordered him out of the vehicle. *See* Def. John Medina's Opening Mem. in Supp. of Mot. to Suppress (hereinafter "Def. Medina's Suppl. Br.") 9. Asking the Defendants to exit the vehicle did not violate the Fourth Amendment. In *Mimms*, "the Court held that 'once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Johnson*, 555 U.S. at 331 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977)). "*Wilson* held that the *Mimms* rule applied to passengers as well as drivers. Specifically, the Court instructed that 'an

15

## 4. The dog sniff measurably extended the traffic stop.

The United States Supreme Court addressed Fourth Amendment issues regarding dog sniffs during lawful traffic stops in two cases: *Illinois v. Caballes*[34] and *Rodriguez v. U.S.*[35] In *Caballes*, the Court held "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed respondent's constitutionally protected interest in privacy."[36] "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."[37]

In *Rodriguez*, the Court elaborated on their decision in *Caballes* by stating "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed."[38] These tasks include checking the validity of the driver's license, reviewing the registration and insurance, and checking for any outstanding warrants.[39] An officer "may conduct certain unrelated checks during an otherwise lawful traffic stop[,]" but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify

---

officer making a traffic stop may order passengers to get out of the car pending completion of the stop.'" *Id.* (citing *Maryland v. Wilson*, 519 U.S. 408, 415 (1997)).

[34] *Illinois v. Caballes*, 543 U.S. 405 (2005).

[35] *Rodriguez*, 575 U.S. at 348.

[36] *Caballes*, 543 U.S. at 408.

[37] *Id.* at 407.

[38] *Rodriguez*, 575 U.S. at 354 (citing *U.S. v. Sharpe*, 470 U.S. 675, 686 (1985)).

[39] *Id.* at 355.

detaining an individual."[40] The question is not "whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff prolongs – i.e., adds time to – the stop[.]"[41]

These decisions' application within the lower courts has varied. Several courts have applied *Rodriguez*'s language strictly, holding that any diversion, however brief, from a stop's traffic-based mission is unlawful without reasonable suspicion.[42] In describing an extension as anything that prolongs or adds time to a stop, "the Court seems to imply that nearly anything an officer does outside the valid, traffic-based inquiries will be unconstitutional."[43] "Left unexplained is how a police officer could possibly perform multiple tasks simultaneously without adding any time to a stop."[44]

Other courts have applied *Rodriguez* in a more nuanced way, adopting something akin to a reasonableness standard.[45] Some courts have found that "phone calls requesting canine assistance are not measurable extensions."[46] In contrast,

---

[40] *Id.*
[41] *Id.* at 357 (alterations omitted).
[42] *U.S. v. Green*, 897 F.3d 173, 180-81 (3d Cir. 2018) (citing *State v. Gomez*, 877 F.3d 76, 82, 91 (2d Cir. 2017); *U.S. v. Evans*, 786 F.3d 779, 782-83 (9th Cir. 2015)).
[43] *Id.* at 180.
[44] *Id.*
[45] *Id.* at 181 (citing *U.S. v. Collazo*, 818 F.3d 247, 257-58 (6th Cir. 2016); *U.S. v. Walton*, 827 F.3d 682, 687 (7th Cir. 2016)).
[46] *Green*, 897 F.3d at 182 (citing *U.S. v. Hill*, 852 F.3d 377, 384 (4th Cir. 2017)).

safety precautions necessary to facilitate an investigation into other crimes may measurably extend a stop.[47]

The Court need not decide between *Rodriguez*'s strict and flexible interpretations because under either standard the dog sniff extended the stop measurably. Even under *Rodriguez*'s flexible interpretation, PFC Vari abandoned confirming Medina's identity and stood outside with Defendants while Stevens was conducting the dog sniff.[48] Accordingly, the State must show the officers had a reasonable articulable suspicion to justify the dog sniff.

### C. Although the stop measurably was extended, PFC Vari had reasonable articulable suspicion to justify a separate seizure and conduct a second investigation.

"[A]ny investigation of the vehicle or its occupants beyond that required to complete the purpose of the traffic stop constitutes a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion."[49]

> We have defined reasonable and articulable suspicion as an officer's ability to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. A determination of reasonable suspicion must be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts. Delaware has codified this standard for investigatory stops and detentions in 11 *Del. C.* § 1902. For the purpose of this analysis, 'reasonable ground' as used in Section

---

[47] *Id.*
[48] *See id.*
[49] *Caldwell*, 780 A.2d at 1047; *Stanley*, 2015 WL 9010669, at *2.

1902(a) has the same meaning as reasonable and articulable suspicion.[50]

Nervousness, criminal history, or use of a rental vehicle alone do not constitute reasonable suspicion unless those elements are coupled with "more tangible, objectively articulable indicators of criminality."[51] Delaware courts, however, routinely have held that officers have reasonable articulable suspicion to further investigate after a suspect provides a false identity.[52]

Medina argues no reasonable articulable facts existed at the time of the traffic stop to establish he was engaged in any criminal activity. The officers' reasonable articulable suspicion for extending the traffic stop and conducting a dog sniff must be measured by what they knew at the time that second seizure occurred.

At the time Cpl. Stevens conducted the dog sniff, the officers knew the driver had produced a degraded photocopy of a foreign driver's license and could not present a more valid form of identification. The picture on that photocopy did not appear to match the driver. The driver's identity had not been verified, and there

---

[50] *Jones v. State*, 745 A.2d 856, 861 (Del. 1999) (internal citations and alterations omitted).

[51] *Bordley*, 2017 WL 2972174, at *3 (citing *Chandler*, 132 A.3d at 144-45; *State v. Miliany-Ojeda*, 2004 WL 343965, at *6 (Del. Super. Feb. 18, 2004); *Huntley*, 777 A.2d at 256).

[52] *See, e.g., Loper*, 8 A.3d at 1175 (finding a passenger's false identification and age gave officers reasonable articulable suspicion); *McElderry*, 2018 WL 4771786, at *3-4 (finding a passenger's giving of false name, along with inconsistent statements, nervousness, and eye contact avoidance, gave officers reasonable articulable suspicion); *Brown v. State*, 2011 WL 5319900, at *3 (Del. Oct. 31, 2011) (finding "the police had a reasonable articulable suspicion of criminal activity . . . after [the defendant] provided false identification to the officers"); 11 *Del. C.* § 1902(b) ("Any person so questioned who fails to give identification or explain the person's actions to the satisfaction of the officer may be detained and further questioned and investigated.").

was a strong possibility a false identity had been given. The vehicle was rented, but the registered renter was not in the vehicle. Both PFC Vari and Cpl. Stevens were given several inconsistent stories by Medina and Umoffia, including how long they had known each other, where they had been, and where they were going.[53] PFC Vari testified that, in his experience, these factors are indicative of persons transporting contraband.[54] Considering the totality of the circumstances, the Court finds that by the time of the dog sniff, the officers had reasonable articulable suspicion for that additional intrusion.

### D. The exterior and interior portions of the dog sniff were valid.

Defendants next argue that, even if the sniff was lawful at its inception, it became an unreasonable search when Cpl. Stevens facilitated K9 Varg's entry into the vehicle through the open passenger door. Medina argues K9 Varg's entry into the vehicle through the open door was not instinctive, but rather occurred because Cpl. Stevens slacked up on his leash. Medina speculates, without any evidence, that Cpl. Stevens could have prevented K9 Varg from entering the vehicle by keeping him at a shorter leash-length. Medina analogizes the facts at issue here to *U.S. v. Winningham*, where the 10th Circuit Court of Appeals found that officers facilitated

---

[53] May 24 Hearing Tr. 33 (two months v. two years); June 13 Hearing Tr. 81 (two months v. two years).
[54] May 24 Hearing Tr. 31.

20

a dog sniff of a stopped vehicle's interior when the officers opened the vehicle's door and the dog handler unleashed the dog as it approached the open door.[55]

Medina's argument is unavailing and *Winningham* factually is distinct. "During the traffic stop, the sniffing of a vehicle's exterior by a trained drug-sniffing canine is not a search within the meaning of the Fourth Amendment, even absent any suspicion that the vehicle contains contraband."[56] During the course of a valid dog sniff, a dog's voluntary entrance into a vehicle does not violate the Fourth Amendment because the animal is acting on instinct and is not a state actor.[57] If, however, the officer places or orders the dog into the vehicle, or otherwise facilitates its entry, that conduct transforms the sniff into a search.[58]

The record evidence supports the conclusion that K9 Varg acted instinctually. Cpl. Stevens testified he did not tell Umoffia whether to open or close the door; he leaves the vehicle exactly as it is found and does not alter the scene in any way.[59]

---

[55] *U.S. v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998); Def. Medina's Suppl. Br. 14.

[56] *U.S. v. Pierce*, 2009 WL 255627, at *5 (D. Del. Feb. 2, 2009) (citing *Caballes*, 543 U.S. at 409-10).

[57] *Id.*; *U.S. v. Stone*, 866 F.2d 359, 262-64 (10th Cir. 1989); *U.S. v. Hutchinson*, 471 F. Supp. 2d 497, 505-10 (M.D. Pa. 2007).

[58] *Pierce*, 2009 WL 255627, at *5 (finding the dog's entry through the open driver's door did not transform his sniff into a Fourth Amendment search); *see, e.g., Hutchinson*, 471 F. Supp. 2d at 507-08 (finding the dog's instinctive action, unprompted and unassisted by police officers, did not constitute a search under the Fourth Amendment); *Stone*, 866 F.2d at 364 (finding no evidence "the police asked [the defendant] to open the hatchback so the dog could jump in. Nor . . . [that] the police handler encouraged the dog to jump in the car[;]" therefore, the dog's instinctive actions did not violate the Fourth Amendment).

[59] June 13 Hearing Tr. 95-96.

Other than the initial walk around the vehicle where Cpl. Stevens guides K9 Varg with his hand, he provides K9 Varg the space to do his job.

> I have to allow him to do what he's trained to do and detect odors. I have to give him enough leash where he can work and he can detect where the odor is coming from. You know, whether he wants to dive underneath a vehicle or jump on top of a vehicle, I have to allow him enough leash to do that. If I hold on to my dog's collar, and tell him to search, I'm not giving him any room to search.[60]

Accordingly, the initial dog sniff, including K9 Varg voluntarily entering the car through the door Umoffia left open, was not a search within the meaning of the Fourth Amendment.

### E. The scope of the search, including reviewing the documents and contacting other experienced officers for assistance, was valid.

Once a dog "alerts," the police have probable cause to believe the vehicle contains narcotics.[61] Under the automobile exception to the Fourth Amendment warrant requirement, "when police have probable cause to believe that an automobile is carrying contraband or evidence, they may search the vehicle without obtaining a . . . warrant."[62] The Court gives weight to Cpl. Stevens' testimony that he recognized K9 Varg's behavior as indicative of an "alert" to the presence of narcotics, and Cpl. Stevens therefore had probable cause to search the vehicle.

---

[60] *Id.* at 104.
[61] *Stone*, 866 F.2d at 364.
[62] *State v. DuBose*, 2016 WL 1590583, at *7 (Del. Super. Apr. 18, 2016).

22

Under the automobile exception, if police have probable cause to search a vehicle, they may search every part of the vehicle and its contents that may conceal the objects of the search.[63] "It has long been recognized by courts that the scope of this search is broader than others, allowing for searches for evidence relevant to offenses other than the offense of arrest, so long as there is probable cause to believe that evidence may be found in the places searched."[64]

The search of the entire vehicle was valid after K9 Varg alerted to the presence of narcotics in the vehicle. It also was reasonable for the officers to look at the documents found in the vehicle. The officers reasonably could check the folders for drugs, money, or other drug-related evidence. Upon finding legal and banking documents in the folders, the officers reasonably could review those documents, if for no other reason than to try to identify the driver, whose name they still could not confirm. Identifying Medina was not, as Defendants contend, distinct from the drug investigation because identifying the driver was necessary to conclude that investigation. Therefore, the scope of the search and the use of the documents was not unreasonable.

---

[63] *U.S. v. Ross*, 456 US 798, 825 (1982); *State v. Manley*, 706 A.2d 535, 539 (Del. Super. 1996); *DuBose*, 2016 WL 1590583, at *7; *see California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.").
[64] *DuBose*, 2016 WL 1590583, at *7 (internal citations omitted).

Additionally, it was not unreasonable for the officers to contact other experienced officers to continue the investigation after finding numerous suspicious legal and banking documents. At that point, the officers had discovered a large amount of cash, banking, IRS, and court documents in names other than those of the vehicle's occupants, and still had not confirmed Medina's identity. Accordingly, contacting other experienced officers was not a separate seizure or unjustified extension of the investigation, but rather a continuation of the officer's investigation in light of their reasonable suspicion that criminal activity was afoot.

## IV. CONCLUSION

Therefore, for all the foregoing reasons, Defendants John Medina's and Grace Umoffia's Motions to Suppress are **DENIED**. **IT IS SO ORDERED**.

Abigail M. LeGrow, Judge

Original to Prothonotary
cc:    Jordan A. Braunsberg, Deputy Attorney General
        John S. Malik, Esquire
        Eugene J. Maurer, Jr., Esquire
        Elise K. Wolpert, Esquire

24