PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2494
_____

UNITED STATES OF AMERICA

v.

JAMEL HURTT,
                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:19-cr-196)
District Judge: Hon. Gene E.K. Pratter
_____

Argued
May 14, 2021

Before: McKEE, JORDAN, and FUENTES, *Circuit Judges.*

(Filed: April 13, 2022)
_____

Leigh M. Skipper
Brett G. Sweitzer   [ARGUED]
Federal Community Defender Office for
the Eastern District of Pennsylvania
601 Walnut Street, Ste. 540 West
Philadelphia, PA   19106
          *Counsel for Appellant*

Matthew T. Newcomer   [ARGUED]
Office of United States Attorney
615 Chestnut Street, Ste. 1250
Philadelphia, PA   19106
        *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

McKEE, *Circuit Judge*.

We are asked to decide whether police officers violated the Fourth Amendment when they seized Jamel Hurtt during the course of a traffic stop of a truck in which he was a passenger. Upon stopping the truck, the officers proceeded to investigate whether the driver was intoxicated. Hurtt was arrested for illegal possession of a firearm when one of the officers involved in the stop discovered he was carrying a gun. For the reasons that follow, we hold that the District Court erred in denying Hurtt's motion to suppress the evidence that was obtained during that stop, and we remand for further proceedings consistent with this opinion.

## I.    Background

Around 2:00 a.m. on February 23, 2019, Philadelphia Police Officers Lance Cannon and Daniel Gonzalez were patrolling North Philadelphia's 35th District, an area both officers described as "very violent."[1] They saw a two-door pickup truck roll through a stop sign and fail to signal a turn.[2] After they pulled the truck over, Officer Cannon approached the truck on the driver's side and Gonzalez approached on the passenger's side.[3] Three people were in the truck: a driver, a front seat passenger, and, in the backseat, Jamel Hurtt.[4]

The driver and front seat passenger both rolled down their windows. As Cannon collected the license, registration, and keys from the driver, the officers smelled alcohol.[5] The

_____

[1] App. at 34, 38–39, 146, 148–49.
[2] App. at 35–36, 39, 146–147, 149.
[3] App. at 35, 39, 94–95, 146–47.
[4] App. at 40, 151.
[5] App. at 40–41, 114, 151, 169.

2

front seat passenger was heavily intoxicated and voluble, and Hurtt, from behind, attempted to calm and quiet him.[6]  When Cannon asked the intoxicated passenger for identification, Hurtt volunteered his as well.[7]  The officers asked the driver to step out for a sobriety test.[8]  He complied and left the door open as he got out of the truck.  Uninvited and without apparent justification, Cannon then "physically [went] into [the truck], partially put[ting his] body into the cabin of the truck" through the open door.[9]  He eventually climbed further into the truck, placing both knees on the driver's seat.[10]  During the subsequent suppression hearing, he explained that he did so for the purpose of "engag[ing]" with the passengers.[11]

While inside, Cannon "look[ed] around" and pointed his flashlight "back and forth around the vehicle."[12]  He testified that the inside was messy, with tools strewn about and a five-gallon bucket on the driver-side rear seat.[13]  While still inside the truck, he noticed that the front seat passenger was trying to divert attention away from Hurtt "by making some kind of movement or sound or something."[14]  Cannon instructed the two passengers to keep their hands visible three times,[15] but they did not comply and kept putting their hands in their pockets or the front of their pants as they complained of the cold February weather.[16]  Cannon then got out of the truck and began walking around to the passenger side.  At some point, "[r]ight before [he] walked around, [he] knew [he] needed to get them out of the [truck]."[17]  After he walked around the front of the truck to the passenger's side, Cannon ordered the front seat passenger out.[18]

---

[6] App. at 44, 152.
[7] App. at 187–88.
[8] App. at 41, 60, 114, 155, 191, 194, 201, 210.
[9] App. at 43, 116–17; Video at 2:43.
[10] App. at 119; Video at 2:52.
[11] App. at 43–44.
[12] App. at 117, 119; Video at 3:13.
[13] App. at 43, 48, 119.
[14] App. at 44.
[15] App. at 43–45, 136–37.
[16] App. at 43–45, 132–33.
[17] App. at 46.
[18] Video at 4:54–56.

3

While Cannon was inside the truck, Gonzalez was administering the field sobriety test to the driver behind the tailgate of the truck.[19] He asked a series of questions about what the driver had been drinking, where he worked, and who the passengers were.[20] As Gonzalez was conducting this inquiry, he did not appear to notice, at first, that Cannon was inside the truck.[21] However, Gonzalez did eventually notice that Cannon was inside the truck after he (Gonzalez) had questioned the driver for about a minute.[22] When Gonzalez noticed Cannon and the predicament he had placed himself in by placing his body inside the truck, Gonzalez paused his sobriety check out of concern for Cannon's safety.[23] Gonzalez testified:

> It was 2 o'clock in the morning. My partner has two unknown occupants in the vehicle. So [the] first thing in my mind was to put [the driver] in the back of [the patrol car] and get back to my partner, try to clear the two males[, i.e., the passengers,] before we could get back to doing the field sobriety test.[24]

Although he had not yet run the driver's license or vehicle identification, or finished the sobriety test, Gonzalez put the driver in the patrol car and went to help clear the passengers.[25] He reached the truck a little more than a minute after pausing his investigation, at which point Cannon had begun getting the front seat passenger out of the truck.[26]

At the same time, while still in the truck, Hurtt turned his back to Cannon and reached toward the tool bucket on the seat next to him.[27] Cannon immediately instructed him to show his hands; Hurtt responded by putting his hands up and saying, "I'm cool."[28] During that exchange, Gonzalez was

---

[19] App. at 41, 43, 153–54, 191.
[20] Video at 2:30–3:15.
[21] Video at 3:33.
[22] Video at 3:39.
[23] Video at 3:30–48.
[24] App. at 156–57.
[25] App. at 155–57.
[26] Video at 4:55.
[27] App. at 46, 48.
[28] App. at 12, 47.

helping the intoxicated front seat passenger get out of the truck.[29]  Hurtt then reached for the bucket a second time, but Cannon caught his arm ordered him out of the truck.[30]  Hurtt complied.  Cannon then searched him and found a loaded handgun in his waistband.[31]

The officers then summoned a backup patrol car and arrested Hurtt.  Thereafter, Hurtt made several statements to the officers during a conversation that occurred without any *Miranda* warnings.[32]  After Hurtt was placed in the backup patrol car, Gonzalez determined that the driver was not legally intoxicated.[33]  Although a computer check revealed that his driver's license had been suspended, the officers permitted him and the front seat passenger to drive away without issuing any citations.[34]  The road-side incident, as captured by Gonzalez's body camera, lasted sixteen minutes and thirty-three seconds from start to finish.  The video mirrors the District Court's factfinding.

A federal grand jury subsequently indicted Hurtt on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).[35]  Before trial, Hurtt moved to suppress the seized handgun and ammunition.  He made several arguments in support of his motion to suppress.  He argued that Gonzalez could have completed the sobriety test sooner and that the officers strayed from a lawful traffic stop when Cannon entered the truck and searched him.[36]  He also argued that, even if the stop were extended lawfully, the officers lacked reasonable suspicion to search him because there was no bulge in his waistband and because Cannon's "furtiveness" testimony was not credible.[37]  The District Court rejected all of these arguments.

---

[29] App. at 47, 123–24, 160.

[30] App. at 48, 50.

[31] App. at 50–51, 207.

[32] The admissibility of those statements is not at issue in this appeal.

[33] App. at 54–56, 166, 182–83.

[34] App. at 135, 167, 205–06.

[35] App. at 3.

[36] App. at 14.

[37] App. at 14.  Hurtt did not, however, argue that Cannon performed an illegal search by entering the truck, perhaps

The District Court reasoned that "the evidence show[ed] that neither the traffic stop nor the DUI investigation had ended when Officer Cannon searched Mr. Hurtt."[38]  The Court credited Gonzalez's testimony that he placed the driver in the cruiser so that he (Gonzalez) could help ensure Cannon's safety.[39]  The Court then reasoned that Cannon conducted a lawful search because he "was justified in looking into the vehicle to maintain the safety of the officers and passengers during the open investigations."[40]  The Court further held that the search of Hurtt was "part of a lawful extension of the traffic stop" because Hurtt engaged in "evasive and non-compliant conduct[, which] constituted . . . traffic-related 'safety concerns.'"[41]  Finally, the Court concluded that, "even if the traffic stop was not lawfully extended (which it was), . . . the officers did have reasonable suspicion to conduct the frisk of Mr. Hurtt[,]" based on his "evasive or furtive conduct."[42]

Hurtt ultimately pled guilty but preserved his ability to appeal the denial of his motion to suppress.[43]  He was sentenced to four years' imprisonment, followed by three years of supervised release.[44]  This timely appeal followed.

## II.    Discussion[45]

---

because the vehicle did not belong to him, and he thus did not have "a legitimate expectation of privacy." *Rakas v. Illinois*, 439 U.S. 128, 148–49 (1978).

[38] App. at 15.

[39] App. at 15.

[40] App. at 15–16.

[41] App. at 16.

[42] App. at 16 (citing *United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997)).

[43] Transcript of Change of Plea Hearing at 21, 42, *United States v. Hurtt*, No. 19-cr-196 (E.D. Pa.).

[44] App. at 4–5.

[45] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.  In reviewing the denial of a motion to suppress, we exercise plenary review over the District Court's legal conclusions and review factual findings for clear error. *United States v. Garner*, 961 F.3d 264, 269 (3d Cir. 2020).  Whether a traffic stop was

A traffic stop, even if brief and for a limited purpose, "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."[46] Such a seizure does not violate the Fourth Amendment, however, if it is reasonable.[47] A police officer's decision to stop a vehicle is reasonable if he or she "ha[s] probable cause to believe that a traffic violation has occurred."[48] Any subsequent investigation "must be 'reasonably related in scope to the'" reasons for the stop.[49] Even if an officer lawfully stops a suspect at first, "it could become 'unreasonable,' and thus violate the Constitution's proscription [against unreasonable searches and seizures], at some later time."[50] If an extension of a stop prolongs it "beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation," the resulting delay must be supported by reasonable suspicion.[51] When reviewing an allegation that a traffic stop started out properly but later was improperly extended, we "look[] to the facts and circumstances confronting [the officer] to determine whether his or her actions during the stop were reasonable."[52]

In *Rodriguez v. United States*, the Supreme Court established a test for judging the lawfulness of an extension of a traffic stop. There, the Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against

---

unlawfully extended is a question of law. *See id.* at 271–72. When reviewing a Fourth Amendment suppression ruling, "[w]e view the evidence presented in the light most favorable to the District Court's ruling." *United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018).

[46] *Clark*, 902 F.3d at 409 (alteration in original) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)).

[47] *See Whren*, 517 U.S. at 810 ("An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances.").

[48] *Id.*

[49] *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)).

[50] *Clark*, 902 F.3d at 409.

[51] *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) (alteration in original) (citation omitted).

[52] *Clark*, 902 F.3d at 409.

unreasonable seizures."[53]  Thus, "a seizure justified only by a police-observed traffic violation, . . . 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission.'"[54]

We considered that test at length in *United States v. Green.*[55]  There, we held that "[a]n unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes."[56]  The required inquiry proceeds in two stages: "we must first determine [if and] when the stop was 'measurably extend[ed]'"; and second, "[a]fter determining when the stop was extended—the '*Rodriguez* moment,' so to speak—we can assess whether the facts available . . . at that time were sufficient to establish reasonable suspicion."[57]  After the *Rodriguez* moment, "nothing later in the stop can inform our reasonable suspicion analysis."[58]  In short, we ask whether the mission of the traffic stop was continuously carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality.  Any break in that mission taints the stop because it is the result of an unreasonable delay.[59]

By way of background, before *Rodriguez*, courts disagreed on "whether a *de minimis* extension of a traffic stop to allow time for a [canine drug] sniff would pass

---

[53] *Rodriguez*, 575 U.S. at 350.

[54] *Id.* at 350–51 (cleaned up).

[55] 897 F.3d 173 (3d Cir. 2018).

[56] *Id.* at 179.

[57] *Id.* (second alteration in original).

[58] *Id.* at 182.

[59] *See, e.g.*, *Garner*, 961 F.3d at 271–72 (holding that there was no unlawful extension of the traffic stop because the officer "had reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop"); *Yoc-Us v. Att'y Gen.*, 932 F.3d 98, 105–06 (3d Cir. 2019) (holding that the officer was justified for first stopping the van for speeding but that it was an unlawful extension to investigate the immigration status of the passengers); *Clark*, 902 F.3d at 410–11 (questioning the passenger after receiving information from dispatch impermissibly extended the stop because the traffic stop's mission "to address the traffic violation that warranted the stop" was complete).

constitutional muster."[60]  *Rodriguez* answered that question by holding that "unrelated inquiries" resulting in even a *de minimis* extension are unlawful if not supported by reasonable suspicion.[61]  Determining the "relatedness" of any given action to the basic mission of investigating a traffic violation requires assessing whether the action was something ordinarily incident to a traffic stop.[62]  Such actions normally include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."[63]  In performing these on-mission tasks, "[o]fficers should be reasonably diligent," and "the best indication of whether an officer has been reasonably diligent is by 'noting what the officer actually did and how he [or she] did it.'"[64]

When evaluating whether an officer was on-mission, we consider the "'legitimate and weighty' interest in officer safety" and thus will tolerate additional intrusions, such as forcing a driver to get out of a vehicle.[65]  This interest, "[u]nlike a general interest in criminal enforcement, . . . stems from the mission of the stop itself."[66]

However, police may not vary from the original mission and thereby create an exigency to support the resulting delay and any subsequent arrest.  This police-created exigency doctrine prevents the government from deliberately creating its own exigent circumstances to justify otherwise

---

[60] *Green*, 897 F.3d at 179.

[61] 575 U.S. at 355 (citation omitted).

[62] *See id.*

[63] *Id.*; *Garner*, 961 F.3d at 271.  The Supreme Court contrasted these types of inquiries with a dog sniff, which "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'"  *Rodriguez*, 575 U.S. at 355 (alteration in original) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)).

[64] *United States v. Yusuf*, 993 F.3d 167, 182 (3d Cir. 2021) (quoting *Rodriguez*, 575 U.S. at 357).

[65] *Rodriguez*, 575 U.S. at 356 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977) (per curiam)).

[66] *Id.*

9

unconstitutional intrusions.[67] *Rodriguez* reasoned that "'safety precautions taken in order to facilitate' investigation of other crimes are not justified as part of a routine traffic stop."[68] Therefore, an officer cannot create a safety concern while off-mission and then rely upon that concern to justify a detour from the basic mission of the traffic stop. The limitations of the Fourth Amendment simply do not tolerate intrusions stemming from a detour from a lawful inquiry that is justified only by an exigency which police themselves have created. Moreover, mere presence in a high-crime area obviously does not, without more, justify an otherwise unconstitutional intrusion.[69] It therefore follows that presence in a high-crime area alone cannot justify a safety concern that would excuse deviating from the original purpose of the detention.

Citing *Rodriguez*, Hurtt argues that the police improperly extended the traffic stop.[70] More particularly, he contends that "[t]he lawful mission of the stop here was to investigate a traffic violation and possible DUI" but the "[p]olice detoured from that mission early in the stop, when they searched the truck, conducted unrelated questioning of its driver, and paused the DUI investigation."[71] "[T]hat detour," Hurtt claims, "added time to the stop and was not independently justified, [and therefore] the stop was unlawfully extended."[72] For this reason, he argues, the "subsequently discovered evidence of [his] unlawful gun possession must be suppressed."[73]

We thus must determine the Fourth Amendment implications of these two officers acting in concert in the dead of night in a high-crime neighborhood, simultaneously concerned with investigating a traffic violation and maintaining each other's safety.

---

[67] *See Kentucky v. King*, 563 U.S. 452, 461 (2011); *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006).

[68] *Green*, 897 F.3d at 182 (quoting *Rodriguez*, 575 U.S. at 356).

[69] *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Brown v. Texas*, 443 U.S. 47, 52 (1979).

[70] Appellant Br. at 28.

[71] *Id.* at 19.

[72] *Id.*

[73] *Id.*

### A. Officer Gonzalez questions the driver during his sobriety test.

Hurtt first alleges that the *Rodriguez* moment—again, the moment that a stop is unjustifiably delayed—occurred when Gonzalez questioned the driver at the outset of the sobriety investigation.[74] We disagree. Gonzalez's questions were all directly related to the sobriety inquiry. After taking the driver behind the truck, Gonzalez began asking questions about the driver's occupation and the identities of the truck's passengers.[75] He also asked where they were going and the distance to their destination. Finally, he explained why the driver had been pulled over in the first place.[76] The conversation with the driver did not prolong the stop because it was part of Gonzalez's inquiry into the driver's sobriety. The truck was stopped precisely to allow such an investigation. The resulting inquiry appropriately included a general discussion to determine whether the driver was confused, disoriented, or otherwise cognitively impaired.

### B. Officer Gonzalez pauses his sobriety investigation.

Hurtt next suggests an alternative *Rodriguez* moment occurred when Gonzalez paused his conversation with the driver to focus on what Cannon was doing in the truck.[77] Although the resulting delay in the field sobriety test was brief, we agree that it improperly extended this traffic stop and the subsequent search of Hurtt was inconsistent with the limitations imposed by *Rodriguez.*

It is uncontested that the initial "mission" of the traffic stop was the DUI investigation of the driver of the truck. While Gonzalez conducted the on-mission field sobriety test, Cannon entered the truck and kneeled on the front seat, putting himself in a very vulnerable position. Consequently, Gonzalez had to interrupt—indeed he stopped—his attempt to determine the sobriety of the driver for the purpose of ensuring Cannon's safety. At that point, neither officer had

---

[74] *Id.* at 28–29.

[75] App. at 154–55.

[76] Video at 3:00–3:33.

[77] Appellant Br. at 29.

reasonable suspicion to search Hurtt.[78]  Without reasonable
suspicion, an inquiry resulting in an extension of the traffic

---

[78] At oral argument, and only in response to questioning by
the panel, the government attempted to argue that Cannon had
developed reasonable suspicion of criminal activity before
Gonzalez paused the sobriety test.  Oral Arg. Tr. at 44–46.
We need not determine whether Cannon had reasonable
suspicion to search Hurtt before Gonzalez paused the DUI
inquiry because the government never raised that argument
until questioned about it at oral argument.  *See Pichler v.
UNITE*, 542 F.3d 380, 396 n.19 (3d Cir. 2008) ("UNITE
failed to raise this argument at all before the District Court or
in any of the briefs before this Court, and only raised the
argument for the first time during oral argument. . . . [W]e
will consider this argument waived and will not address it.");
*United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J.,
concurring in the judgment) ("The rule that points not argued
will not be considered . . . at least in the vast majority of
cases, distinguishes our adversary system of justice from the
inquisitorial one.").  Nevertheless, this argument would likely
fail because the video evidence and Cannon's own testimony
indicate that he did not have reasonable suspicion before
Gonzalez paused the test.  Each time Cannon discussed when
he decided to search the truck's passengers, he linked his
decision to his walking around to the passenger's side of the
truck (or to the moments "right before" he did so).  App. at
46.  When asked to "approximate how much time had passed
since when [he] first left the cruiser and approached the truck
until this period whe[n] [he was] walking to the passenger's
side of the truck," he responded, "I would say about maybe
three minutes."  *Id.*  As is apparent from the question as well
as his use of "would," "about," and "maybe," Cannon was
approximating how long into the stop he decided to search the
passengers.  Accordingly, this statement is not exact.  We
therefore cannot simply ask whether Gonzalez was on- or off-
mission at minute 3:00 on the video.  That is especially true
since the video shows us exactly when Cannon walked
around the front of the truck: minute 4:43—a full minute and
ten seconds *after* Gonzalez is clearly seen stopping his DUI
interrogation of the driver.  It therefore appears that Cannon
developed reasonable suspicion *after* Gonzalez paused the

stop is unlawful if not related to the mission (i.e., off-mission).  We thus must ask whether ensuring Cannon's safety was a related inquiry to the field sobriety test, justifying this otherwise unconstitutional extension.

We are unconvinced by the government's argument that being in a high-crime area justifies this extension.[79]  Likewise, Cannon's attempt to explain his conduct by saying that he wanted to "engage" the passengers does not put the resulting extension of the stop back on-mission.[80]  Even if Cannon were concerned with enhancing the security of the traffic stop, it is not at all apparent how "engag[ing]" with the passengers by getting inside the truck with two unknown passengers enhanced security.[81]  On the contrary, this precarious conduct required Gonzalez to pause the sobriety test so that he could ensure his partner's safety.  Because Cannon created a safety concern by going off-mission, the officers cannot rely upon that concern to justify detouring from the original purpose of the traffic stop.[82]  Moreover, even if Cannon had been suspicious before entering the truck, such suspicion would not justify kneeling on the front seat inside the truck with two unknown passengers.[83]  Ensuring

---

field sobriety test, but, again, this presents a factual issue that is unnecessary for us or the District Court to confront at this juncture.

[79] *See Wardlow*, 528 U.S. at 124; *Brown*, 443 U.S. at 52.

[80] App. at 43.

[81] App. at 43.

[82] *Green*, 897 F.3d at 182 ("'[S]afety precautions taken in order to facilitate' investigation of other crimes are not justified as part of a routine traffic stop." (quoting *Rodriguez*, 575 U.S. at 356)); *see also King*, 563 U.S. at 461 (explaining that the "'police-created exigency' doctrine" prevents police from relying on an exigency that was "'created' or 'manufactured' by the conduct of the police"); *Coles*, 437 F.3d at 366 ("Exigent circumstances, however, do not meet Fourth Amendment standards if the government deliberately creates them.").

[83] *See Mimms*, 434 U.S. at 110–11 (recognizing the "inordinate risk confronting an officer as he [or she] approaches a person seated in an automobile" as justification for ordering occupants out of a car).

13

Cannon's safety was thus not a related inquiry. Accordingly, pausing the field sobriety test for this reason was off-mission.

The District Court found that Cannon "was [initially] justified in looking into the vehicle to maintain the safety of the officers and passengers during the open investigations."[84] Cannon did not just look inside the truck, however. He entered it. He kneeled on the front seat with only his feet dangling outside the door. In doing so, he placed himself in jeopardy and created a situation whereby Officer Gonzalez felt compelled to pause the DUI inquiry to ensure Cannon's safety.[85] Again, this type of police-created exigency cannot justify going off-mission. Because this off-mission conduct was without reasonable suspicion and extended the traffic stop, it was unlawful under *Rodriguez* and the subsequent search violated Hurtt's Fourth Amendment rights.

Moreover, as should be obvious from our discussion, we are not persuaded by the government's argument that the Fourth Amendment intrusion resulting from Gonzalez going off-mission was permissible because the off-mission conduct was *de minimis*. We need only address this argument briefly as *Rodriguez* clearly forecloses it. In *Rodriguez,* the Court held that even *de minimis* extensions of a traffic stop for "unrelated inquiries," such as checking on Cannon's off-

---

[84] App. at 15–16.

[85] Cannon's conduct was a Fourth Amendment search and thus off-mission, if not supported by reasonable suspicion. *See United States v. Pierce*, 622 F.3d 209, 213–14 (3d Cir. 2010) (distinguishing between a drug-sniffing dog jumping into a car of its own volition and being induced to do so by an officer to determine whether a Fourth Amendment search occurred); *United States v. Ngumezi*, 980 F.3d 1285, 1289 (9th Cir. 2020) ("apply[ing] a bright-line rule that opening a door and entering the interior space of a vehicle constitutes a Fourth Amendment search" and holding that an officer violated the Fourth Amendment when he "leaned in across the plane of the door"); *see also New York v. Class*, 475 U.S. 106, 114–15 (1986) ("While the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police.").

mission activity, are unlawful.[86]  To allow for even *de minimis* extensions in effect would allow "an officer [to] earn bonus time to pursue an unrelated criminal investigation."[87]  Whether or not Gonzalez's off-mission activity caused "only" *de minimis* delay is irrelevant to our holding that pausing the sobriety inquiry to ensure Cannon's safety after he climbed into the truck ran afoul of *Rodriguez* and violated Hurtt's Fourth Amendment rights.

### III.    Conclusion

Here, Officers Cannon and Gonzalez did what *Rodriguez* prohibits.  Officer Cannon created a safety concern while off-mission from the purpose of the original traffic stop and thereby prolonged Hurtt's detention.  Since the disputed evidence was only uncovered after the officers went off-mission, the officers wrongly extended the traffic stop and violated Hurtt's Fourth Amendment right to be free from unreasonable searches and seizures.  We thus reverse the District Court's denial of Hurtt's motion to suppress, vacate the judgment of conviction, and remand.

---

[86] *Rodriguez*, 575 U.S. at 355, 356 ("On-scene investigation into other crimes, however, detours from [an ordinary traffic stop's] mission.  So too do safety precautions taken in order to facilitate such detours." (citation omitted)).
[87] *See id.* at 357.