UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-3191
_____

UNITED STATES OF AMERICA

v.

QUARUAN CHANCE,
                              Appellant

_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. No. 2-20-cr-00002-01)
District Judge:  Honorable Arthur J. Schwab
_____

Argued
January 17, 2024
_____

Before:  JORDAN, BIBAS, and AMBRO, Circuit Judges

(Filed: March 14, 2024)
_____

Christopher J. Cassar
The Cassar Law Firm
13 E. Carver Street
Huntington, NY   11743

John J. Dowling, III   [ARGUED]
Dowling Defense Group
101 N. McDowell Street
Suite 200
Charlotte, NC   28204
        *Counsel for Appellant*

Laura S. Irwin
Matthew S. McHale   [ARGUED]
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA   15219
       *Counsel for Appellee*

_____

OPINION*

_____

JORDAN, *Circuit Judge*.

Quaruan Chance appeals the District Court's order denying his motion to suppress evidence obtained during a traffic stop.  Because the police officer involved lawfully stopped Chance, and because he had a reasonable suspicion that Chance was engaging in criminal activity when he found the evidence, we will affirm.

I.      **BACKGROUND**[1]

Pennsylvania State Police Trooper Glenn Adams is a member of the Safe Highways Initiative through Effective Law Enforcement Detection Unit and has received over 200 hours of specialized training in interdicting criminal activity on highways.  On the morning of December 30, 2019, he was parked in a marked police car on the shoulder of the Pennsylvania Turnpike, which he knew was a drug corridor, so called "for [its]

_____

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

[1] The facts, which are undisputed, are taken from the District Court's findings of fact, from the suppression hearing held before that Court, and from the dash camera footage of the traffic stop.  Citations to "MVR" are to the dash camera video, followed by the minute and second mark of the recording.

2

efficiency to transport drugs … across the country." (J.A. at 104.)  The weather that morning was "somewhat overcast," and the road was wet.  (J.A. at 12.)

Chance was driving a new Jeep Grand Cherokee when he passed Adams.  As he did so, Adams noticed that Chance sat upright in the driver's seat, pulled himself closer to the steering wheel, and slowed down significantly, even though he was driving at the posted speed limit of 70 miles per hour.  After observing what he deemed to be Chance's nervous behavior, Adams began following Chance, who was traveling in the left lane. Chance moved from the left lane to the right lane, directly behind a tractor-trailer, leaving only about one to two car lengths of space between the vehicles, a distance that Adams determined to be unsafe and a violation of Pennsylvania traffic law.  Chance then moved back into the left lane, passed the tractor-trailer, and returned to the right lane, directly in front of the tractor-trailer, and again leaving only about two car lengths of space between the vehicles.  After making the pass, Chance momentarily drifted onto the fog line on the right side of the road.  Adams concluded that the pass and the drifting also violated the traffic code.

While watching Chance, Adams observed that the Jeep "was very plain and with limited exterior personalization" and "the registration … was a New York 'J-Series' tag." (J.A. at 15.)  Those observations were significant to Adams because he knew that "individuals involved in criminal activity will often use plain vehicles like [the] Jeep to blend in with the innocent motoring public" and, "at the time of this traffic stop, the State of New York (which sequentially registers their vehicles) was issuing J-series tags," so it was a relatively new registration, and "drug smugglers would flip and re-register

3

registration tags so as to defeat ongoing surveillance techniques[.]" (J.A. at 15 (internal quotation marks omitted).)

Adams activated his lights and siren, and Chance pulled the Jeep to the side of the road. Adams approached the Jeep and told Chance, "Hey, just a couple quick things, okay, I don't plan on writing you a ticket or anything." MVR 01:53-01:59. He then explained to Chance that he stopped him for not leaving enough space when he moved in front of the tractor-trailer and asked him to provide his driver's license, car registration, and insurance card. Chance was nervous and his hand was shaking when he handed over the documents. Adams then asked Chance to come to the patrol car, explaining that his request was for safety reasons, and told him, "I will get you a warning and get you out of here." MVR 03:11-03:17. Nevertheless, even after being told he would receive only a warning, Chance remained nervous.

When Adams and Chance were in the patrol car, Adams conducted a criminal history check and a computer database query on the documents he requested from Chance. Adams also "made conversation" by asking Chance a series of questions about his background, employment status, family, travel plans, and criminal history, among other things. (J.A. at 19.) In response to Adams's questions, Chance said he was from Brooklyn and was on his way to pick up his son in West Mifflin, Pennsylvania, explaining that he was planning to sleep there for six hours and then go back to Brooklyn. When Adams asked him if he had been arrested before, he said "of course" and that it was for "a weapon[,]" without providing any additional detail. (J.A. at 19). He later told

4

Adams that he was on parole for a firearms violation and that the Jeep was his cousin's, who was letting him borrow it.

Adams did not believe Chance's story and suspected that he was drug trafficking. He knew that New York City, including Brooklyn, was a "major narcotics supplier[] to areas such as … West Mifflin[,]" that West Mifflin "is saturated with narcotics[,]" and that it is "a destination which relies heavily on cities such as New York City to supply narcotics[.]" (J.A. at 20 (internal quotation marks omitted).) He also knew that drug smugglers would "often take short turnaround trips[,] leaving little time at their destination to limit the amount of time they could be interdicted by law enforcement[,]" and that they often "utilize third party vehicles because doing so provides them a defense and distances them from any contraband that could be located within the vehicle[.]" (J.A. at 20 (internal quotation marks omitted).) Adams had Chance step out and stand in front of the patrol car and then called for backup.

After backup arrived, Adams approached Chance and asked if there was anything illegal in the Jeep. Chance responded, "no." (J.A. at 21.) Adams then told Chance, "I'd like to search the car, okay?" MVR 15:49-50. In response, Chance twice said "Yeah," consenting to the search. MVR 15:50-15:52. Adams went into the Jeep, looked in the dashboard area around the media system, and discovered an aftermarket hidden compartment. Inside the compartment, he found a kilogram of cocaine in a vacuum-sealed package. Adams then arrested Chance and recited the *Miranda* warnings.

A federal grand jury returned a one-count indictment charging Chance with possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and

5

(b)(1)(B)(ii). Chance filed a motion to suppress all evidence obtained at the traffic stop. The District Court held an evidentiary hearing over two days, in which Adams was the only witness.

The District Court concluded that Adams made a lawful stop because Chance had committed traffic violations. It also concluded that Adams did not illegally prolong the traffic stop because, even while Chance was still sitting in his Jeep, Adams had developed reasonable suspicion that Chance was engaging in drug trafficking. Therefore, the District Court denied Chance's motion to suppress.

Chance pled guilty to the charge in accordance with a plea agreement that preserved his right to appeal the denial of his suppression motion. The District Court sentenced him to the mandatory minimum sentence of 60 months' imprisonment, followed by four years of supervised release.

This timely appeal followed.

## II. DISCUSSION[2]

### A. Adams Did Not Unlawfully Stop Chance[3]

A police officer is permitted "to initiate a brief investigative traffic stop when he has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (internal quotation marks omitted). "[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006). "[A]n officer need not be factually accurate in [his] belief that a traffic law had been violated but, instead, need only produce facts establishing that []he reasonably believed that a violation had taken place." *United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006).

Here, the District Court determined that Adams reasonably believed that Chance had committed a traffic violation by following the tractor-trailer too closely. The Pennsylvania Vehicle Code provides that a driver "shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." 75 Pa. Cons. Stat. § 3310(a).

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291. "In reviewing the denial of a motion to suppress, we exercise plenary review over the District Court's legal conclusions and review factual findings for clear error." *United States v. Hurtt*, 31 F.4th 152, 158 n.45 (3d Cir. 2022). "We view the evidence presented in the light most favorable to the District Court's ruling." *Id.* (cleaned up).

[3] A determination of reasonable suspicion is generally reviewed de novo on appeal. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

Chance left only one-to-two car lengths of space between the Jeep and the tractor trailer while traveling about 70 miles per hour on a wet road. It was not unreasonable for Adams to believe that following a vehicle that closely at that speed, and under those road conditions, was a traffic violation.

Chance asserts that the government "superimposed a speed-to-car-length ratio[] on top of the text of section 3310(a) as if that were the law." (Opening Br. at 14.) His assertion is wrong. The government did not say the statute required at least two car lengths when following another vehicle; it simply contended that the two-car-length (or less) space between Chance and the tractor trailer was too short considering the circumstances at the time. Furthermore, the District Court found that Adams credibly testified that "based on his training and experience, he did not believe it to be reasonable for Defendant to follow the tractor-trailer that closely, given the road conditions, and that even on a nice, sunny day, [he] would not have considered his following distance reasonable." (J.A. at 13 (internal quotation marks omitted) (alteration in original).) We agree with the District Court that Chance's tailgating violation provided Adams a lawful reason to stop Chance.[4]

---

[4] Because Chance's tailgating violation provided a sufficient reason for the stop, we need not discuss his two other alleged traffic violations: cutting closely in front of the tractor trailer and drifting over the fog line.

8

## B. Adams Did Not Unlawfully Extend the Traffic Stop[5]

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). "A seizure justified only by a police-observed traffic violation, therefore, 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation" "and attend to related safety concerns[.]" *Id.* at 350-51, 354 (cleaned up) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The instant that a stop ceases to be for activities related to the traffic stop's mission is known as the "*Rodriguez* moment." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018).

"To prolong a stop beyond [the *Rodriguez* moment], the officer must have acquired reasonable suspicion during the mission to justify further investigation." *United States v. Clark*, 902 F.3d 404, 410 (3d Cir. 2018). If an officer "did indeed possess reasonable suspicion [prior to the *Rodriguez* moment], [the defendant] suffered no constitutional injury in the course of the traffic stop." *Green*, 897 F.3d at 179.

The reasonable suspicion standard requires an officer to "have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring." *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020). Reasonable suspicion "must always be evaluated under the totality of the circumstances." *Green*, 897 F.3d at 183. It

---

[5] "Whether a traffic stop was unlawfully extended is a question of law" that we review de novo. *Hurtt*, 31 F.4th at 158 n.45.

9

"cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each." *Id.* And, "when assessing the totality of the circumstances, courts recognize the particular ability of law enforcement officers, based on training and experience, 'to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Id.* (cleaned up) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

"In light of *Rodriguez*, we must first determine when the stop was 'measurably extended.'" *Id.* at 179 (cleaned up). "After determining when the stop was extended[,] … we can assess whether the facts available to [Adams] at that time were sufficient to establish reasonable suspicion that [Chance] was involved in drug trafficking." *Id.*

Before the District Court, the parties agreed that the *Rodriguez* moment was when Chance stepped out of Adams's patrol car after he was questioned. Chance's District Court brief stated explicitly: "The *Rodriguez* moment was when Mr. Chance stepped out of the police car." (J.A. at 405.) Chance now argues for the first time that the *Rodriguez* moment occurred when Adams extended the stop "by asking forty-one questions that did not have anything to do with the traffic stop." (Opening Br. at 7 (internal quotation marks omitted).)

"It is well-established that arguments raised for the first time on appeal are not properly preserved for appellate review." *Simko v. United States Steel Corp.*, 992 F.3d 198, 205 (3d Cir. 2021). Accordingly, Chance has forfeited the argument that the *Rodriguez* moment occurred before he stepped out of the patrol car.

10

Having identified the *Rodriguez* moment as the time Chance left the patrol car, we must now determine whether Adams had reasonable suspicion at that point to continue the stop. We agree with the government that "there was ample basis for reasonable suspicion to investigate possible drug-trafficking," based upon six factors considered in their totality:

> (1) unusual nervousness; (2) evasiveness in self-reporting his criminal history; (3) a previous drug-related arrest and parole for a firearms conviction; (4) travel from a narcotics source city to a destination along a known drug corridor; (5) a quick turnaround despite a long drive; and (6) a third-party vehicle with recent registration.

(Answering Br. at 34-35.) Chance's attempt to weaken each individual piece of that evidence does not alter the total picture when viewing the evidence collectively. Therefore, we conclude that Adams had reasonable suspicion of drug trafficking by the time Chance stepped out of the patrol car and that, accordingly, the District Court did not err in concluding that Adams did not unlawfully extend the traffic stop.

Even if the *Rodriguez* moment had, in fact, occurred earlier, however, we also agree with the District Court that Adams had developed a reasonable suspicion of criminal activity when Chance was still sitting in the Jeep. The District Court explained:

> At the time of the legal stop, Trooper Adams had already observed: (1) Defendant's behavior upon passing the trooper's vehicle[;] (2) Defendant's Jeep was very plain and with limited exterior personalization; and (3) that the registration of Defendant's Jeep was a New York "J-series" tag. In this same moment, due to his training and experience, including the specialized SHIELD training, Trooper Adams knew that: (1) individuals involved in criminal activity often use plain vehicles like the Jeep to blend in with the innocent motoring public; (2) at the time of this traffic stop, the State of New York (which sequentially registers their vehicles) was issuing J-series tags, and that drug smugglers would "flip and re-register registration tags so as to defeat ongoing surveillance techniques[;]" and (3) illegal drugs are often

11

transported from New York to Pennsylvania. Thereafter, upon telling Defendant as he sat in the Jeep that he was only going to get a written warning and not a ticket, Defendant's nervous behavior did not subside.

(J.A. at 25-26.)

For the reasons stated by the District Court, we agree that Adams had a reasonable and articulable basis for why he suspected criminal activity, based on the combination of the particular road Chance was driving on, his vehicle's exterior appearance, the specific series of license plates that were on the vehicle, and Chance's nervous behavior, especially after Adams told him that he would only be receiving a warning. Each of the facts the District Court relied upon may not in itself create reasonable suspicion, but together, viewed in the light of the District Court's factual findings, and recognizing Adams's ability, based on his specialized training and experience, "to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person[,]" we too conclude that Adams had a reasonable suspicion of criminal activity when Chance was still in the Jeep.[6] *Green*, 897 F.3d at 183 (internal quotation marks omitted).

## III.   CONCLUSION

For the foregoing reasons, we will affirm the District Court's denial of Chance's motion to suppress.

---

[6] Because Adams did not unlawfully extend the traffic stop, Chance's cursory argument that his "consent to the search was invalid because Chance had been illegally detained when he gave it" is incorrect. (Opening Br. at 28.)

12